## THE STATE v. JESSE B. WEBB, Appellant.

Division Two, February 2, 1909.

1. **CONSPIRACY: Suicide.** Under the statute (Sec. 1822, R. S. 1899) a person deliberately assisting another in the commission of self-murder, is guilty of manslaughter in the first degree.

2. ———: ———: **Withdrawal.** Two or more persons may conspire to commit a criminal act, yet there is always a place of repentance, a *locus penitentiae*, and before the act is done, whether it be suicide or other homicide, either may withdraw and avoid the criminality of the criminal act.

3. ———: ———: ———: **Instruction: Withdrawal of Deceased.** An instruction which tells the jury that if deceased committed suicide, and defendant counseled, advised and assisted her to do so, yet before the act was committed changed his mind and endeavored to dissuade her from such purpose, then the mere fact that he did change his mind and endeavored to dissuade

her will not excuse him, unless she led him to believe in good faith that she had abandoned such purpose and then afterwards killed herself of her own volition and not under his influence, is erroneous. It makes his withdrawal from the common design or conspiracy dependent upon her withdrawal.

4. ——: ——: ——: ——: ——: **Burden.** Said instruction is also erroneous in that it went further and charged that "if defendant did counsel, advise and assist his wife to commit suicide and she afterwards killed herself, the burden is on defendant to show that such killing was done of her own volition and not under the influence of his advice, counsel or assistance." It violates the rule that in criminal prosecutions the burden is on the State to establish the guilt of the defendant and not upon the defendant to prove his innocence.

5. ——: ——: ——: **Proper Instruction.** The court should have given this instruction asked by defendant: "If the jury believe from the evidence that the defendant procured a pistol with which he and the deceased intended to commit suicide and afterwards changed his mind and tried to escape from the consequences of such an agreement but deceased refused to permit him to escape therefrom and on account of physical weakness he could not by force leave her, and that she did the shooting, then defendant did not deliberately assist her to commit self-murder and is not guilty of manslaughter in the first degree." The instruction, under the circumstances of the case, properly presented to the jury the facts which constituted defendant's withdrawal from the suicide agreement.

6. **CONFESSION: Unusual Circumstances.** As the result of an attempt by defendant and his wife to commit suicide, she was shot in the head and heart, and he received a severe wound near the heart, and lost much blood and was greatly weakened when he made his statement to the coroner, who reduced it to writing and defendant signed it by mark. He ordinarily could write his name. He denied that he had made the statement and testified that he had no remembrance of it. *Held*, that the ordinary instruction in regard to the presumption arising against the defendant from statements made against himself, should not, under the circumstances, have been given, but should have been qualified by requiring the jury to find that defendant was in such condition of mind and body as to be able to know the answers he was making, and to understand the questions propounded to him, and that the same were read over to him and that he understood the statements contained therein.

Appeal from Clay Circuit Court.—*Hon. Francis H. Trimble,* Judge.

REVERSED AND REMANDED.

*Ben A. Reed, W. J. Courtney* and *Martin E. Lawson* for appellant.

(1) Instruction 5, given for the State, is wrong. It places the burden of proof on defendant to show that Inez Walkup killed herself of her own volition and not under the influence of his advice, counsel or assistance. It was the duty of the State to prove beyond a reasonable doubt that defendant was deliberately present assisting, counseling and advising her to commit suicide. The burden does not shift to defendant. State v. Wingo, 66 Mo. 181; State v. Hickam, 95 Mo. 322; State v. Hardelein, 169 Mo. 579; Tobacco Co. v. United States, 77 U. S. 266; State v. Thornton, 41 L. R. A. 530; State v. Schweitzer, 57 Conn. 532; Phillips v. State, 8 Am. St. Rep. 471; Tiffany v. Com., 121 Pa. St. 165; 2 Bishop's New Criminal Procedure (4 Ed.), secs. 599, 600; 1 Ib., sec. 1049. (2) Instruction 11 is ordinarily a correct statement of the law. In this case it was a great injustice because a man weakened by consumption, shot near the heart, burning with fever, having lain in a room in that condition all day with a morbid crowd passing in and out, was called upon to make a statement to be couched in language employed by an official eager to convict some one, and so ignorant he misspelled many words, both medical names and common words, and evidently unable to put the meaning of defendant into language capable of conveying anything like the same meaning, and yet who wrote, read and signed the statement. Under these conditions, the court says in instruction 11, "what the proof may show you that the defendant has said against himself, if anything, the law presumes to be true, because

against himself.'' The law is not a farce—that is not
the law. Defendant has no recollection of the state-
ment, and denies it. The jury should have been re-
quired to find that defendant was in such condition
of mind and body as to be able to know what answers
he was making and to have fully understood the quer-
ies, and to have found that this doctor really wrote
the substance of what he asked and was told, and
that he really read the statement to defendant who
at the time was in condition to understand it and did
understand it. 2 Bishop's New Criminal Procedure
(4 Ed.), sec. 604. (3) Instruction A, asked by defend-
ant, should have been given. If defendant did recon-
sider his purpose to die with Inez Walkup and did
try to secure her agreement not to commit said act,
and if he was not fully satisfied that she had abandon-
ed her idea of suicide and yet permitted a loaded pis-
tol to be within her reach, and if he was physically
able to put it beyond her reach then he was culpably
negligent. R. S. 1899, sec. 1834. (4) Instruction B,
refused, should have been given. No conviction can
result unless every material element of the crime is
proven beyond a reasonable doubt. The State's in-
struction sets out the material facts necessary for con-
viction. The jury should be told that unless all such
material facts are proven they cannot convict. Com.
v. McKie, 61 Am. Dec. 410; 1 Bishop's New Criminal
Procedure (4 Ed.), sec. 1049.

*Elliott W. Major*, Attorney-General, and *John M.
Atkinson*, Assistant Attorney-General, for the State.

Instruction 5 should be considered in the light of
the proof in this cause. Appellant testified as a wit-
ness in his own behalf, and admitted that he and de-
ceased entered into a contract, agreement and con-
spiracy to commit suicide; that they came to Smith-
ville for that sole purpose; that they had made two

ineffectual attempts just prior to the fatal day; that appellant bought the pistol late on the afternoon previous to the morning of the tragedy, and even after he had 'phoned the second time for his friend, Reed, to come and take him away. The proof shows that appellant was able to walk to the store where he purchased the revolver, a distance of one hundred yards or more, from the hotel, and the further fact that appellant was shot himself, are all strong earmarks showing that the contract and conspiracy to commit suicide were being carried out as agreed upon. The law is well settled in this State that the act of one conspirator in a common design is the act of all conspirators connected therewith, whether present or absent. It has been a crime to aid, counsel or assist another to commit suicide, even as far back as the case of Rex v. Tyson, Russ. & Ry. C. C. 523 (a case where the husband and wife had agreed to commit suicide and went to the river for that purpose, and throwing themselves in, the wife was drowned, and the husband escaped). The mere act of advising another to commit suicide is unlawful, and if the latter acts on such advice and kills himself, the former is guilty. Com. v. Bowen, 13 Mass. 356; Com. v. Mink, 123 Mass. 422; Reg. v. Allison, 8 Car. & P. 418; Blackburn v. State, 23 Ohio St. 146; Burnett v. People, 204 Ill. 208. Our Legislature has seen fit to make the deliberate aiding of another to commit suicide manslaughter in the first degree. Sec. 1822, R. S. 1899; State v. Ludwig, 70 Mo. 412; State v. Fitzgerald, 130 Mo. 407. After appellant admits all the facts of the contract and conspiracy between himself and deceased to commit suicide, the preparation therefor, and the carrying out of this contract on the part of the deceased and the ugly wound received by appellant, as he states, then appellant comes into court and says that he withdrew from the contract and conspiracy to commit sui-

cide on the evening before, and that deceased consented to such withdrawal.

GANTT, P. J.—The defendant has appealed to this court from the conviction of manslaughter in the first degree, at the November term, 1907, of the circuit court of Clay county.

The prosecution was begun on November 7, 1906, by the prosecuting attorney of Clay county filing an information in the circuit court, duly verified, wherein he charged the defendant with having on the 11th day of October, 1906, feloniously, deliberately, premeditatedly, on purpose and of his malice aforethought shot and killed one Inez Webb. He was duly arraigned and entered his plea of not guilty and the cause as above stated was tried at the November term, 1907.

The evidence tended to show that at the Peddicord Hotel in Smithville, Clay county, on the morning of the 11th day of October, 1906, the defendant Jesse Webb and Inez Webb or Walkup were both shot. Defendant received a pistol bullet near the heart and the deceased received three bullet wounds near the heart and one through the head. She died immediately. Prior to the shooting for some months both the defendant and the deceased worked at the State Hospital for the Insane at St. Joseph, Missouri. They had associated together for some time and the evidence tended to show that he was a consumptive. He quit work at the Hospital October 1, 1906, and she quit work some two days later. They were both employed at the Hospital as day nurses. He had been employed at the Hospital about two years, and she had been employed there from seven to twelve months. They had been associated together for about two months. Dr. Woodson, the Superintendent of the Hospital, testified that Webb was run down and not strong and he had prescribed malt and cod liver oil for him. After leaving the Hospital, defendant went down into

the city of St. Joseph to live, and deceased followed him and they remained together, holding themselves out as man and wife. After remaining a few days in St. Joseph, they went to Plattsburg to visit his relatives, where they remained a few days. While there he was very sick. They left Plattsburg, saying they were going to Hot Springs, Arkansas, for his health, and started, but went to Smithville where they remained several days. At Plattsburg the deceased said that when the defendant died she wanted to die too. The defendant in his testimony stated that she suggested that they commit suicide, but he refused. After reaching Smithville, however, they agreed to commit suicide together, and wrote letters to their relatives indicative of their intention so to do. The deceased bought morphine, which they both took on Monday night, but they waked up about one o'clock on Tuesday. The deceased then said she would get some strychnine. She got it and they took it Tuesday night. The strychnine did not kill them and they waked up about ten or eleven o'clock Wednesday morning. The defendant then got the deceased to telephone to a Mr. James Reed at Trimble, Missouri, to come to him at Smithville, and Reed in response arrived at Smithville that evening at five or six o'clock. Prior to Reed's arrival at Smithville, however, defendant purchased a revolver from a Mr. Dougherty, who was a clerk in a hardware store, and who loaded the revolver for him. When Reed arrived at Smithville, the deceased and the defendant were in bed. She represented herself as Mrs. Webb, and Reed sat down on the edge of the bed and the defendant requested him to take defendant to Edgerton to his brother Louis Webb. Reed started to get defendant's clothes for him, but the deceased got between Reed and the clothes and told him that defendant was not going away from there; if he did, she would follow him and kill him. Reed then left them and told them he would be back in the morning,

but before he reached the hotel the next morning both
of them had been shot.  Reed testified that the de-
fendant was awfully weak and was spitting blood, and
he could scarcely hear him talk.  The defendant tes-
tified that the evening before the shooting he aban-
doned his purpose to destroy himself.  And after Reed
left the hotel that evening, he had a long talk with
the deceased, endeavoring to persuade her to give up
the idea of suicide, and he thought she had given it
up, and they then agreed to take the pistol back to the
store in the morning and get back what money they
could; that the pistol was then put under the pillow
until morning and they went to sleep.  He was awak-
ened the next morning by something against his breast.
As he opened his eyes, she said, "Here is where we
die," and shot him.  He testified that he knew no more
until he heard the parties breaking into the room.
The shooting occurred about 8:30 Friday morning.
When the people broke into the room they found the
deceased dead and the defendant in a spasm.  One
of the witnesses testified that before they broke in
the door he heard the man saying "Shoot me again."
The other witness heard this statement, but he thought
it was immediately after he got into the room.  De-
fendant testified that he did not know in which hand
the deceased held the revolver, that he had no recol-
lection of her shooting herself.

The statement of the defendant was offered in
evidence, which had been taken by the coroner, but
the defendant testified that he had no remembrance
of making any statement whatever.  The statement
was signed before the coroner by defendant's mark.
In this statement the defendant said his wife did the
shooting and as soon as she shot him she lay down
on the bed and shot herself two or three times.  She
put her arms around his neck and said, "Oh, Jess, are
you dead?"  She said this, however, before she shot

herself. He also stated that they were married a week before at Topeka, Kansas, and then went to St. Joseph and Plattsburg and then came to Smithville; that he had a hemorrhage from his lungs, which caused him to get off at Smithville. They had started to Hot Springs. His reason for wanting to die was that he had tuberculosis and did not think he could live long any way, and she said her reason for dying was because she loved him and did not want to live without him. He also testified that his wife wrote a letter to her father and one to a Mrs. Hart. And he wrote one to his sister and mother, and they left a note requesting the landlady to mail the letters and notify his brother.

The court instructed the jury on murder in the first degree and on manslaughter in the first degree. As the jury found the defendant guilty of manslaughter only, the charge of murder is eliminated from the case. The fifth instruction is in the following words:

"If the jury believe from the evidence that deceased committed suicide and that defendant counseled, advised and assisted deceased to do so, then, even though defendant may have changed his mind before the act was committed and endeavored to dissuade her from such purpose, then the mere fact that defendant did change his mind and endeavor to dissuade her will not excuse defendant from such counsel, advice and assistance, if any, unless you believe that deceased led defendant to believe in good faith that she had abandoned such idea, and then afterwards killed herself of her own volition, and not under the influence of his counsel, advice and assistance, if any, to do so. And if he did counsel, advise and assist her to commit suicide and she afterwards killed herself, the burden is on defendant to show that such killing

was done of her own volition and not under the influence of his advice, counsel or assistance, if any.''

The questions presented for our consideration relate entirely the correctness of the instructions given and refused.

I.  Under the common law, if one counseled another to commit suicide and the other, by reason of the encouragement and advice, killed himself, the adviser was guilty of murder as an aider and abettor, provided he was present when his advice was carried out.  It was ruled in Rex v. Tyson,  Russ. & Ry. 523, that if two persons mutually agree to die together and, in pursuance of the agreement, each attempts to kill himself, but the means employed to produce death takes effect on only one, the survivor is guilty of murder.  But under the statute of this State, section 1822, Revised Statutes 1899, ''Every person deliberately assisting another in the  commission  of self-murder shall be deemed guilty of manslaughter in the first degree.''  The crucial point in the case is as to the correctness of instruction number five as above set out in the statement of the cause.  It will be noted that this instruction required the jury to find, first, that the deceased committed suicide, and, second, that the defendant counseled, advised and assisted her to do so.  And then directed the jury that even though the defendant changed his mind before the criminal act was committed and endeavored to dissuade her from such purpose, then the fact that he did change his mind and endeavor to dissuade her will not excuse him from such counsel, advice and assistance, unless the jury believe that the deceased led the defendant to believe in good faith that she had abandoned such idea, and then afterwards killed herself of her own volition, and not under the influence of his counsel, advice and assistance, if .any, to do so.  The diligence of counsel has not availed to find a precedent

for this instruction, and we have been unable to find any, and accordingly the correctness of this instruction must be determined upon reason and the analogies of the law.

In effect we take it that this prosecution is based upon the theory of a conspiracy between the defendant and the deceased that each should commit suicide and the instruction directs the jury in effect that although the defendant withdrew from the conspiracy before the suicide was committed by deceased and although he endeavored to dissuade her from her purpose to kill herself, these facts did not excuse the defendant from his previous agreement and advice to commit suicide, unless the deceased led the defendant to believe that she also had abandoned such idea, and then killed herself of her own volition. It is a general principle of the criminal law that although several parties conspire to do a criminal act, there is a place of repentance, a *locus penitentiae,* so that before the act is done, either one or all of the parties may abandon their design and thus avoid committing the criminal act. [U. S. v. Britton, 108 U. S. l. c. 205.] This principle is familiar in the law of homicide. Thus it is said: "Though a man should be in the wrong in the first instance, yet a 'space for repentance is always open, and where a combatant in good faith withdraws as far as he can, really intending to abandon the conflict,' and his adversary still pursues him, then, if taking life becomes necessary to save his own, he will be justified." [State v. Partlow, 90 Mo. l. c. 627; 1 Bishop's Criminal Law (5 Ed.), sec. 871; Horrigan and Thompson on Self-Defense, 227; 4 Blackstone's Com., 184.] The instruction seems to concede this principle of permitting the defendant to abandon his previous intention of committing suicide, and agreeing that the deceased should also do so at the same time, but this right is made dependent upon the fact that the deceased also abandoned her purpose to com-

mit suicide and led the defendant to believe in good faith that she had done so. It seems to us that this qualification of the right is not reasonable or based upon a sound principle. If there is anything in the doctrine of a space for repentance, it seems to us when the defendant abandoned his purpose of committing suicide and endeavored to persuade the deceased to also abandon it, that he had done all that the law could exact of him. If in spite of his announced intention to refuse to go further in the criminal purpose and his persuasion and advice to also abandon such a purpose, the deceased proceeded to kill herself, then it was her own act, and one for which the defendant cannot and ought not in any way, in our opinion, be held responsible, and under the circumstances he could not properly be convicted of deliberately assisting her in the commission of self-murder.

. But the instruction is, in our opinion, also bad in that it places the burden on the defendant to show that the suicide of the deceased was committed of her own volition and not under the influence of defendant's advice and counsel. We think this instruction violates the rule that in a criminal prosecution the burden is upon the State to establish the guilt of the defendant and not upon the defendant to prove his innocence. [State v. Hickam, 95 Mo. l. c. 329; State v. Hardelein, 169 Mo. 579.]

In the last-cited case it is said: "Where a defendant pleads not guilty and admits nothing against himself, as in the case at bar, the burden of proof is on the State to first make out a case against him which would entitle it to go to the jury, but this does not change the burden of proof, which remains with the State throughout the trial, and whether or not the evidence is sufficient to overcome the presumption of innocence of defendant, and to establish his guilt beyond a reasonable doubt, when all of the evidence

on both sides, including the presumptions, is considered, is for the consideration of the jury. [1 Bishop's New Crim. Proc. (4 Ed.), sec. 1050; State v. Darrah, 152 Mo. 522.]"

Our best judgment is that upon both of these grounds this instruction was erroneous and should not have been given in this form. It denied the defendant the right to repent of his ill-considered promise to commit suicide with the deceased, and erroneously placed the burden upon him of proving his innocence instead of requiring the State to prove his guilt beyond a reasonable doubt.

II. Error is also assigned upon the refusal of the court to give instructions A, B, C and D requested by the defendant.

Instruction D is in these words: "If the jury believe from the evidence that the defendant procured a pistol with which he and the deceased intended to commit suicide and afterwards changed his mind and tried to escape from the consequences of such an agreement but deceased refused to permit him to escape therefrom and on account of physical weakness he could not by force leave her, and that she did the shooting, then defendant did not deliberately assist her to commit self-murder and is not guilty of manslaughter in the first degree." This instruction contains the substance of instruction C requested, and announces the opposite of the instruction five given by the court, which we have just held erroneous. In our opinion this instruction D was a proper one, and should have been given, and instruction numbered 5 given by the court should have been refused. We think there is no error in refusing instruction B requested by the defendant as the court had fully covered that proposition in its own instructions, and the same can be said as to instruction A.

III. Counsel complains also of instruction numbered 11 given by the court, which is the ordinary in-

struction in regard to the presumption arising against
the defendant from statements made against himself.
Counsel concede that this instruction is ordinarily a
correct one, but that it should not have been given in
the peculiar circumstances of this case, because the
alleged statement made by the defendant to the cor-
oner was made, if at all, when the defendant was in
a very critical condition, suffering from a pistol-shot
wound near the heart and weakened by disease, and
was too weak to sign his name, and that the instru-
ment itself indicates that the writer of it himself was
incapable of correctly taking the statement as indi-
cated by the misspelled words both medical and com-
mon.   There is much force in this objection.   The evi-
dence shows that the defendant could write his own
name and yet he did not sign this statement himself
and it was signed by the coroner and attested only by
the mark of the defendant.   The defendant testified
that he had no recollection whatever of ever having
made the statement and denies making it.   We think
that under the circumstances of the case, if this in-
struction should have been given at all, a qualification
should have been added thereto requiring the jury to
find that the defendant was in such a condition of mind
and body as to have been able to have known the
answers he was making, and to fully understand the
questions propounded to him by the coroner and that
the same was read over to him and that he under-
stood the statements contained in it.   While the in-
struction numbered 11 has often received the approval
of this court, it has often been assailed as a comment
on the testimony.   This court has often ruled that
while an instruction may be correct in the abstract
it should always be applicable to the facts in evi-
dence, and we think that the qualification suggested
by counsel under the peculiar facts of this case is
one that should have been given along with the in-
struction, if given at all.

For the error in giving instruction numbered five and the refusal of instruction D, the judgment should be and is reversed, and the cause remanded for a new trial in accordance with the views herein expressed.

All of this division concur.