**STATE of Missouri, Respondent,**

v.

**Calvin (Doc) HOLT, Appellant.**

No. 53529.

Supreme Court of Missouri,
Division No. 1.

Dec. 9, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Timothy D. O'Leary, Special Ass't. Atty. Gen., Kansas City, for respondent.

J. Herbert Taylor, Ozark, William L. Mason, Jr., Galena, for appellant.

HENLEY, Presiding Judge.

Defendant was charged by an amended information with murder, second degree. Section 559.020.[1] Specifically, the charge is that he killed George Youngblood by stabbing him in the chest with a knife during a fight in the Nite Hawk Tavern in Reeds Spring, Stone county, Missouri, Friday night, July 16, 1965. The case was submitted on voluntary manslaughter only. A jury found him guilty thereof and assessed his punishment at imprisonment in the penitentiary for two years. His motion for new trial was overruled and he was sentenced in accordance with the verdict. Defendant appeals. We affirm.

1. Section references are to Revised Statutes of Missouri, 1959, and V.A.M.S.

The issues on appeal relate to the sufficiency of the evidence to sustain the conviction and to the giving and refusal of instructions.

Defendant offered no evidence; he stood on his motion for judgment of acquittal filed at the close of the state's case. The state's evidence, in the light most favorable to the verdict, is as follows. Jack Logan and his wife, Betty, operators of the Nite Hawk Tavern, were both present serving their customers on the night of July 16. Mr Logan describes the tavern and its furnishings and fixtures as follows. The building is approximately 40 feet wide across the front (north-south) and 50 feet deep (east-west), the front entrance being at the east end facing on the main street of the town. The furnishings and fixtures consist of a bar roughly 30 feet long with 14 bar stools bolted to the floor close to and running parallel with the south wall, nine tables with four chairs for each, a music or "juke" box next to a post near the center of the building, and a one-lane bowling machine 14 feet long adjacent to and running parallel with the north wall. As one enters the front door of the tavern the bar is on his left; the bowling machine is on his right; directly in front of him approximately six or eight feet from the door is the first table and chairs, beyond this another six or eight feet the second table and chairs, beyond this another six or eight feet another table and chairs, and beyond this another six feet the juke box; to his right and between this line of tables and the bowling machine were located the other tables and chairs, similarly spaced.

Defendant, Calvin Holt (better known as "Doc"), his son, Freddie, and Freddie's wife, entered the tavern about 11:30 or 11:45 that evening and seated themselves at the first table and ordered and were served two beers for the men and a soft drink for Mrs. Holt. Some ten minutes later George and Loren Youngblood, brothers, entered the tavern, seated themselves at the second table, and ordered two beers. Mr. Logan learned that "trouble" was "brewing" between the occupants of these two tables and when he served the Youngblood table, he sat down and asked what the trouble was about. In the meantime Freddie Holt had started a bowling game with another tavern patron, Floyd Henderson. As George Youngblood was answering Jack Logan that " * * * there wasn't anything wrong," Loren Youngblood got up, shoved Logan over and onto the floor, grabbed George's bottle, walked over to Freddie Holt and broke the bottle over the latter's head. While these two were swinging fists and chairs at each other in the north part of the tavern another fight started at or near the "juke" box between George Youngblood and defendant, Doc Holt. Apparently no one present saw all of this fight or how or when it started and ended; at least, those who testified said they did not, some being engaged in stopping the fight between Loren and Freddie.

Floyd Henderson testified that while he was helping Jack Logan stop the fight between Loren and Freddie, he saw Doc Holt and George Youngblood fighting near the west end of the bar, between the bar and a table; that when he saw them " * * * Doc Holt had just piled into a [bar] stool and George Youngblood had a chair in his hands * * *;" that George was standing beside Doc while the latter was down between the stools and "struck at" Doc with the chair, but he could not see whether he hit Doc that time; that he turned his attention back to the first fight about the time Doc got up; that he next saw Doc and George standing up with this chair between them, each holding onto it, and then he saw George " * * * walking * * * funny-like * * *" from the area of the "juke box" toward the bowling machine; that " * * * he [George] started sinking [and] fell in the floor near a table; that blood was coming from the breast of George. This witness further testified that he did not see Doc Holt hit George Youngblood at any time; that he did not see any one else near Doc and George while they

fought or when George walked toward the bowling machine and fell to the floor mortally wounded.

Jimmy Dale and Billy K. Mease, brothers, testified that they were in the tavern when the fight started between Loren and Freddie; that they had started to leave by the back door but stopped for a few seconds when they saw George Youngblood and Doc Holt fighting near the "juke box"; that George hit Doc with a chair knocking him into and down between the bar stools; that "* * * nobody was close" to Doc and George while they were fighting; that they did not see a knife or other weapon in Doc Holt's hands.

Jack Logan further testified that he saw no part of the fight between Doc and George, because he was busy stopping the fight between Loren and Freddie; that when he next saw Doc Holt the latter was "* * * about a step * * *" from where George Youngblood was lying on the floor, walking toward the front door to join his son and his son's wife outside the tavern.

Dr. David Gorelick, a pathologist, testified that he performed an autopsy on the body of George Youngblood at about 6:00 a. m. on July 17, 1965; that he found two stab wounds on the body produced by a metallic instrument approximately three inches long with a sharp point, one edge of which was dull and the other sharp; that the first wound (not fatal) was on the right lower extremity near and above the knee and angled upward; that the second was an oblique wound in the right chest angling to the right and down; this wound cut through a rib and penetrated a lung and the heart; that this wound would, and did, produce death within a matter of minutes.

William B. Kuhl, a deputy sheriff, testified that he drove out to Doc Holt's residence about 3:00 a. m. on July 17th to arrest him; that Holt was not at home when he arrived and he waited; that Holt drove up alone in his station wagon within a few minutes; that he arrested Holt and searched him, but did not find a knife or other weapon.

Sheriff James R. Barnes testified that he talked to defendant at the county jail; that defendant told him he owned a heavy knife he used on the farm and that "* * he used it to cut sprouts and around on the farm, and he had carried it in the glove compartment of his station wagon. And he also stated that if he had taken that knife into the tavern with him the night of the happening, that he didn't remember it. He also stated if he did the stabbing, he didn't remember it."

◼ We hold that the foregoing is sufficient substantial evidence to sustain the conviction for manslaughter; that the court did not err in overruling defendant's motion for judgment of acquittal.

Defendant contends that the court erred in giving a circumstantial evidence instruction (instruction No. 4) which defined "direct" evidence, because there was no direct evidence on the "main fact" required to be proved by the state, viz., that defendant stabbed deceased in the chest with a knife. A related point is that the court erred in refusing to give defendant's instruction "A" which told the jury that the state seeks to convict on circumstantial evidence and "that there is no direct evidence that any witness saw the defendant commit the crime charged * * *." He concludes that instruction 4, for the reason asserted, misdirected the jury and was confusing and misleading. But, he does not explain or demonstrate how the instruction misdirected the jury or how or in what respect it could have misled or confused the jury.

Instruction 4 is no doubt patterned after a similar instruction found in State v. Regazzi, Mo., 379 S.W.2d 575, at l.c. 578, a case in which the evidence of defendant's guilt was wholly circumstantial. The court held in *Regazzi* that the trial court erred in refusing to give the instruction. That instruction told the jury that evidence is of

two kinds, direct and circumstantial; it defined both kinds of evidence, and then told the jury that a crime may be proven by either kind, but, as to circumstantial evidence, the facts and circumstances should be consistent with each other and defendant's guilt, and inconsistent with any reasonable theory of his innocence.

■ The instruction in the instant case follows the same pattern as other circumstantial evidence instructions found in the reported cases.[2] The fact that the instruction defines direct evidence as one of two kinds of evidence where there is no direct, eye-witness evidence of the actual act of stabbing did not result in a misdirection of the jury. The main portion of this instruction, the directing portion, related solely to circumstantial evidence and cautioned the jury as to how it should view, consider and weigh that evidence; it made no reference to the preceding definition portion. The definition of direct evidence, as compared with and in contrast to circumstantial evidence, was a necessary part of the instruction after the court had told the jury that evidence is of two kinds. We conceive of no manner in which the instruction could have misled or confused the jury.

■ As to the court's refusal to give instruction A, defendant asserts that this instruction was necessary " * * * to cure the error created by the giving of Instruction 4." Instruction A was not necessary for the reason stated; no error was created by the giving of instruction 4. Moreover, the court correctly refused instruction A, because to give it would have had the effect of excluding from consideration of the jury direct evidence of the fierce and wild fight between deceased and defendant during which deceased somehow received the wound from which he died within minutes after the fight.

■ Defendant's next point is that the court erred in giving the manslaughter in-

struction (No. 8), because it was not supported by substantial evidence. The instruction is supported by substantial evidence.

Defendant's last point is that instruction No. 9 erroneously states the law in that it "reversed the burden of proof" on his defense of self-defense; that it required him to prove "beyond a reasonable doubt" that he acted in self-defense. The instruction is as follows: "You are further instructed that if you find and believe from the evidence, [1] beyond a reasonable doubt, that the defendant, Calvin Holt, on the date and at the place mentioned in other instructions, did make an assault upon George Youngblood by stabbing and wounding George Youngblood with a knife and that George Youngblood did die of said wounds, but [2] that in so doing, the defendant, Calvin Holt, acted in self-defense as that term is defined in other instructions, then you will find the defendant, Calvin Holt, not guilty." (The numbers in brackets are supplied for convenience and clarity in discussing the instruction.)

■ In the first place this is not a burden of proof instruction; it does not require defendant to prove anything. Of course, the defendant has no *burden* on the issue of self-defense; all that is required to raise this issue is that there be a prima facie or substantial showing, by evidence produced by defendant or the state, of the elements of self-defense. When the issue is thus raised, the burden still rests on the state to prevail thereon beyond a reasonable doubt. State v. Davis, 342 Mo. 594, 116 S.W.2d 110, 112 [2–6].

Defendant relies on State v. Duisen, Mo., 428 S.W.2d 169, and cases cited therein at l.c. 175 [4], in support of his contention that this instruction reversed or shifted the burden of proof to him. *Duisen,* at l.c. 175 [4], involved a contention that the use of the word "established" in an instruction on the burden of proof of mental

2. For cases in addition to Regazzi, supra, in which similar instructions will be found, see Volume 9A, Missouri Digest, Criminal Law, ☜No. 784(2, 4).

disease or defect casts a greater burden on defendant than the law requiires. The cases cited in *Duisen,* to which defendant refers, involved self-defense instructions which used the word "established," the use of which was held to be prejudicial error in State v. Davis, supra. Obviously, these cases do not involve or decide the question raised by defendant and are not authority supporting his position.

 As we construe the instruction, its purpose was to inform the jury that if defendant acted in self-defense, as defined in the next numbered instruction (No. 10), it should find him not guilty. The preceding words in the first portion, which we have numbered 1 in brackets, were merely the preface, premise or introduction to the main or second portion, which we have numbered 2 in brackets. In effect, all the instruction does is tell the jury that if they believe (beyond a reasonable doubt, as required by the law) that defendant stabbed and killed deceased, *but,* in so doing, he acted in self-defense then he is not guilty. The word "but" between the two numbered portions of this instruction is used in the sense of "on the other hand," "yet," "except," "notwithstanding that," to express a degree of restriction on or modification of the first portion.[3] As so used, the sense of the instruction is "notwithstanding that" you may find and believe beyond a reasonable doubt that defendant stabbed and killed deceased you will find him not guilty if, in so doing, he acted in self-defense. The instruction does not require the jury to find beyond a reasonable doubt that defendant acted in self-defense; it required only that the jury find the facts hypothesized in the first portion of the instruction beyond a reasonable doubt. While the instruction is not a model to be followed, it did not erroneously state the law; it did not shift the burden of proof.

The court gave the usual instruction on presumption of innocence and reasonable doubt which told the jury that the burden of proof was on the state to prove defendant's guilt beyond a reasonable doubt. And, of course, the manslaughter instruction (which recognized the defense of self-defense as defined in instruction 10) required the jury to find the facts hypothesized therein beyond a reasonable doubt. With this emphasis on the state's burden of proof, we fail to understand how the jury could have been confused or misled on that issue by instruction 9.

We hold that the court did not err in giving instruction No. 9.

Examination of other matters we review under Rule 28.02, V.A.M.R. discloses no error.

The judgment is affirmed.

STORCKMAN, J., concurs; SEILER, J., concurs in result.

---

3. See Webster's Third New International Dictionary, p. 303.