STATE of Missouri, Respondent,

v.

Jerry Lynn PARKER, Appellant.

Nos. 57512, 57513.

Supreme Court of Missouri,
Division No. 1.

April 8, 1974.

Motion for Rehearing or to Transfer to Court en Banc Denied May 13, 1974.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Asst. Atty. Gen., Jefferson City, for respondent.

Shaw & Howlett, Charles M. Shaw, Clayton, for appellant.

WELBORN, Commissioner.

Appeals from consecutive life sentences on jury verdicts of guilty on two charges of murder in the first degree. By stipulation, both charges had been tried together.

Shortly after 8:00 A.M. on September 4, 1970, the bodies of Hazel Kimberlin and her 11-year-old son Michael were discovered in the store portion of a combination country-store-residence operated and occupied by the Kimberlins and located at the junction of Routes W and N, near the western edge of Washington County. Each of the victims had been shot through the head.

Clyde Kimberlin, the husband and father, had left the store and residence on the morning of September 3 and had taken a load of hogs to Illinois. He stayed overnight there and was preparing to leave for home the next morning with a load of feed when he was notified of the deaths.

A neighbor, Mrs. Dace, had seen Mrs. Kimberlin at around 6:30 P.M. on September 3. Mrs. Kimberlin had walked approximately ¼ mile to Mrs. Dace's residence and the two of them had walked about ¼ mile farther when Mrs. Kimberlin returned home. At about 9:30 P.M. Mrs. Dace received a telephone call from Mrs. Kimberlin. When Mrs. Kimberlin's body was found, she was dressed as she had been when she and Mrs. Dace had been walking.

At 9:30 P.M., September 3, a telephone call had been placed from the Kimberlins to the residence of Paul Parker in Sullivan. Paul is the father of appellant, Jerry Lynn Parker.

Mrs. Kimberlin was a school teacher. Her body and that of Michael were discovered by a teacher with whom Mrs. Kimberlin rode to work. The teacher had gone to the Kimberlin residence when Mrs. Kimberlin failed to appear at the usual time to go to the school where they taught. Jerry Lynn Parker, then 17 years old, testified that he heard of the killings at school on the afternoon of September 4. At around 7:30 P.M., Jerry Lynn called the Franklin County Sheriff's office and told a deputy that he had been at the Kimberlins at around 9:30 P.M. the night before. He told the deputy that he had run out of gasoline and had gone into the house and called his parents' residence. He said that Mrs. Kimberlin had let him siphon three gallons of gasoline from her vehicle which he put in his and returned to his parents' residence at Sullivan.

After the telephone call, the sheriffs of Franklin and Washington Counties and Sergeant Anthony Viessman of the State Highway Patrol went to the Parker residence and interrogated Jerry Lynn. He repeated the story that he had reported by telephone. He also told the officers that while he was at the Kimberlins Mrs. Kimberlin had called a neighbor to inquire if she had any gasoline. He told the officers that when he left, Mrs. Kimberlin and Michael were standing on the porch. Jerry Lynn denied that he had a gun at the Kimberlins and denied any involvement in the deaths.

There was no evidence of forced entry and nothing appeared to have been taken from the store. The cash register drawer was partially open, but its contents had not been disturbed.

Three spent .45 caliber shell casings were found at the site of the killings. In April, 1970, a .45 caliber automatic had been stolen from the residence of Thomas Stout, Jr., 2½ to 3 miles east of Sullivan. After talking to Parker on the evening of September 4, Sergeant Viessman went by Stout's house and got the spent casing of a shell Stout had fired from the gun on January 1, 1970. That casing and one found in Mrs. Kimberlin's hair were sent to the Highway Patrol laboratory for study.

Jerry Lynn had gone "steady" with Shirley Brand during the summer of 1970. She had seen Jerry with a .45 caliber weapon which he called "Jimmy." She had seen him fire the weapon in August of 1970.

On September 5, the Washington County sheriff and other law enforcement officers took Jerry Lynn to the Kimberlin store and he repeated his prior story.

Charles Gray, Jr., a friend of Jerry Lynn's, was interrogated by police officers on Sunday, September 6. He told them that Jerry had come by the place where he worked on the afternoon of September 4 and asked to borrow a car because he wanted to get rid of the gun. He refused to lend his auto to Jerry. At around 6:00 P.M., Jerry came by the store and told Gray that he had scattered the parts of the gun from Sullivan to Stanton.

Sunday afternoon, September 6, Jerry Lynn was again taken into custody by law enforcement officers and questioned about the .45 caliber automatic. Several officers accompanied Jerry to various places, looking for the weapon. At around 6:30, Officer Brand of the Sullivan Police Department and father of Shirley told Jerry that he was suspected of the murders and that if he was innocent he would have to have the gun to prove it. Jerry told Brand he would talk to him and the two of them rode around. Jerry told Brand that he had been at the Kimberlins and the gun had been there, but that he didn't murder anyone. Jerry directed Brand to drive to the cemetery. While they were going through the cemetery, Jerry asked Brand for a file to file the firing pin of the gun. Brand took Jerry to Brand's house where he got a file and gave it to Jerry. They returned to the cemetery and Jerry went to some brush and lifted a flower pot from a drain pipe and reached in and brought out the trigger and firing pin part of a weapon. Jerry took that part back to the car and used the file on the firing pin. He then directed Brand to another place in the cemetery where he pulled the handle, minus the grips, from under some cedar debris. The two parts fit. Jerry said he had "stomped" the barrel part in the ground and they looked for it but it got too dark. He told Brand that he had thrown the other pieces of the gun away. Before they left the cemetery, Jerry dropped the pieces into some water in a rut in the road, saying "Let's make it look like it's been out here quite a while."

The serial number on one of the parts corresponded with the number on the gun stolen from Stout. Ballistic tests by a Highway Patrol technician led him to conclude that the shells found at the scene and in Mrs. Kimberlin's hair had been fired from a weapon of which the pieces found in the cemetery were a part.

At Jerry Lynn's trial, his parents testified in support of his testimony which repeated his original story. His father testified that Jerry had taken a Chevrolet convertible without permission; that when he learned of the call about being out of gas, he drove out Route N as far as the Kimberlin store and didn't see his son. He went by the store at about 10:00 P.M. His mother testified to receiving the telephone call from Jerry while he was at Kimberlins, to driving to Kimberlins to take gas to Jerry and not finding him, and to calling her residence and finding Jerry home, with the explanation that Mrs. Kimberlin had let him siphon gas from her auto.

Mrs. Mary Ivy, who knew Mrs. Kimberlin, testified for the defense that she drove past the store at around 9:45, September 3, 1970, en route to Bourbon from Cape Girardeau. She noticed four or five young men near the driveway to the store, 200 to 300 feet from the store. She saw two cars at the store and another near where the boys were. None was a convertible.

On the basis of evidence of the facts as above outlined and other evidence not here alluded to, the jury found Jerry Lynn guilty of first degree murder in both deaths.

In this court, the first assignment of error is based upon the admission into evidence of three photographs of the scene taken shortly after the first law enforcement officers arrived on the morning of September 4. The photographs depicted the bodies of the victims, lying where they had been found. Appellant objects that the photographs were "macabre" and "gruesome" and that they did not tend to connect appellant with the crime, prove de-

ceased's identity, show the nature of the fatal wound or throw any relevant light on a material matter in issue and therefore they should have been excluded.

■■ The recent case of State v. Johnson, 486 S.W.2d 491, 494–495 [1–2] (Mo. 1972) fully sets forth the law on this issue. Admission in evidence of a photograph taken at the scene of a crime is not precluded because a dead body is pictured. The trial court has discretion in the admission of such evidence which will not be disturbed when the photographic evidence throws light on relevant issues. Here the photographs depicted the scene. Such a picture was of probative value in this case because it corroborated the state's witnesses' testimony. They also were of value in demonstrating the nature of the killing, significant in view of the contention of appellant that a second degree murder instruction should have been given. The admission of the photographs was not error. State v. Johnson, supra; State v. Strong, 484 S.W.2d 657, 661–662 [13, 14] (Mo. 1972).

In the cross-examination of Officer Brand, he was asked whether or not he told Parker that if he knew where the gun was, it would prove he was innocent if he in fact was. Brand replied:

"No, sir. I said if that gun didn't kill them it would prove that the gun he stole was not the murder weapon."

Counsel for defendant moved for a mistrial on the grounds that the answer was not in response to any question to the witness by defense attorney. The trial court refused to declare a mistrial, but promptly advised the jury that the statement relating to the theft of the gun should be disregarded.

■ The trial court's action was all that the circumstances required. Failure to grant a mistrial was not error. State v. Mallory, 423 S.W.2d 721, 723 [2] (Mo. 1968). The only ground urged at the trial

was that the statement was not responsive. It was not wholly unresponsive, inasmuch as the inquiry to the witness was whether or not he made a certain remark to Parker about the pistol and the witness's response stated what in fact the remark was.

Appellant now raises the further objection that the remark brought in evidence of another crime. No such objection was voiced in the trial court. There is no necessity to consider the admissibility of evidence of the theft of the weapon as within one of the recognized exceptions to the rule prohibiting evidence of other crimes. The statement was not permitted to stand in evidence and the trial court's conclusion that a mistrial was not called for will not be disturbed. State v. Camper, 391 S.W.2d 926 (Mo.1965); State v. Smith, 431 S.W. 2d 74, 82–83 [21–24] (Mo.1968).

Appellant's next assignment of error is based on the trial court's sustaining an objection by the state in the examination in chief of the appellant.

Sergeant Viessman testified that he was present when appellant and Officer Brand returned to the Sullivan City Hall, after the discovery of the parts of the .45. According to Viessman, appellant at that time said "that I had no evidence against him except a serial number; the barrel and the firing pin were gone." On questioning by defense counsel, appellant denied having made such a statement. His version of the conversation was: "Well, he [Sergeant Viessman]—he told me that it—if I was innocent that I would go with him and take a lie detector test. And I told him that—that—of course, they didn't have any reason to hold me and that I would take a lie detector test."

Defense counsel's next question was interrupted by an objection by the prosecutor after the words "Did you—" had been uttered. Out of the hearing of the jury, the prosecutor objected to any testimony with reference to polygraph tests. Defense counsel responded that he was not trying

to get in the results of a polygraph test and was trying only to get in the conversation with Sergeant Viessman. The trial court stated that any evidence of polygraph tests would be inadmissible and told defense counsel that he would know how to ask questions designed to refute Viessman's testimony. A request for mistrial at that point was overruled.

■ There was no error in the trial court's ruling that calls for reversal. The trial court did not rule that defense counsel could not produce further testimony by the appellant of his version of the conversation with Sergeant Viessman. Defense counsel dropped the matter, despite the invitation of the trial court to continue as to the conversation, and there is no showing, in any event, whether or not there was evidence of further conversation which might have been produced. On this record, there is no basis for concluding that appellant was precluded from testifying to the whole conversation with Sergeant Viessman and no basis for concluding that the trial court's ruling was erroneous.

■ The trial court did not err in refusing the motive instruction offered by appellant. State v. Stevens, 467 S.W.2d 10, 26 [29] (Mo.1971); State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734, 737 [6] (1947); State v. Logan, 344 Mo. 351, 126 S.W.2d 256, 260–262 [12]–[17] (1939); State v. Koch, 322 Mo. 106, 16 S.W.2d 205, 210–211 [7, 8] (1929); State v. Glenn, 262 S.W. 1030, 1033 [8, 9] (Mo.1924); State v. Hulbert, 299 Mo. 572, 253 S.W. 764, 767 [8] (1923); State v. Clinton, 278 Mo. 344, 213 S.W. 841, 843 [10] (1919); State v. Santino, 186 S.W. 976, 977–978 [2–4] (Mo. 1916); State v. Aitken, 240 Mo. 254, 144 S.W. 499, 503 [6] (1912).

The statement in State v. Henderson, 301 S.W.2d 813, 816–817 [1] (Mo.1957), to the effect that a defendant is entitled to a motive instruction if he requests it is dictum and contrary to the law expressed in the above-cited cases. Henderson relied upon State v. Brown, 181 Mo. 192, 217, 79 S.W. 1111 (1904), as authority. In State v. Logan, supra, the court had previously rejected Brown as authority for the proposition for which it was cited in Henderson.

■ The evidence in this case did not require an instruction on murder in the second degree. The evidence showed that at least three shots were fired inside the store from the .45 weapon. A spent slug was found in the ground beneath the floor on which the body of each victim was found. This evidence showed that the fatal shots were fired at the victims while they were lying on the floor. The evidence that Mrs. Kimberlin had placed a telephone call while appellant was in the store would support the conclusion that she was thereafter forced to lie on the floor and that she and her son were shot while they were lying on the floor. Such circumstances adequately supported a charge of murder in the first degree and did not call for a second degree murder instruction. State v. Cuckovich, 485 S.W.2d 16, 26 [19] (Mo. banc 1972); State v. King, 433 S.W.2d 825, 827–828 [5–7] (Mo.1968); State v. Kenyon, 343 Mo. 1168, 126 S.W.2d 245, 249–250 [3, 4] (1938).

State v. Johnson, 505 S.W.2d 94 (Mo. 1974), does not control on this issue. The circumstances in that case pointing to deliberation were ambiguous and therefore a second degree instruction was required. State v. Cuckovich, supra, cited in Johnson, and decided by the Court en banc in 1972, holds that the fact that the evidence in a homicide case is circumstantial does not require an instruction on lesser degrees in a first degree murder case.

■ Appellant attacks the burden of proof and presumption of innocence instruction because of the inclusion of the phrase that a reasonable doubt to authorize an acquittal should be a "substantial doubt." This complaint has been voiced against such an instruction in many cases

and found without merit. State v. Scott, 491 S.W.2d 514, 520 [11] (Mo. banc 1973).

MAI–CR No. 2.20 does eliminate such language, but in view of the repeated approval of the instruction given, the trial court is not to be convicted of error.

Neither Johnson v. Bennett, 393 U.S. 253, 89 S.Ct. 436, 21 L.Ed.2d 415 (1968) nor United States v. Atkins, 487 F.2d 257 (8th Cir. 1973), requires a holding that the language of the instruction given in this case produced an infringement upon federal constitutional rights of the appellant.

The circumstantial evidence instruction given in this case was in the conventional form which has received prior approval of this court. State v. Holt, 434 S.W.2d 576, 578–579 [2] (Mo.1968); State v. Regazzi, 379 S.W.2d 575, 579 [3] (Mo. 1964). The requirement that the circumstantial evidence, in order to warrant a conviction, must be "inconsistent with any reasonable theory of the innocence of the defendant" does not impose upon the defendant the burden of producing evidence of a theory of innocence. Under the instruction the burden of disproving "any reasonable theory of the innocence" remains upon the state. Johnson v. Bennett, supra, in which an instruction requiring a defendant to establish his alibi defense by a "preponderance of the evidence" was held bad is not here in point.

Judgment affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

SEILER and HOLMAN, JJ., concur.

BARDGETT, P. J., concurs in result.