STATE of Missouri, Respondent,

v.

Robert Louis DENSON, Jr., Appellant.

No. KCD 29377.

Missouri Court of Appeals,
Kansas City District.

Oct. 30, 1978.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 27, 1978.

Application to Transfer Denied
Jan. 8, 1979.

James F. Speck, Bellmann & Speck, Kansas City, for appellant.

John D. Ashcroft, Atty. Gen., Gregory W. Schroeder, Asst. Atty. Gen., Jefferson City, for respondent.

Before HIGGINS, Special Judge, Presiding, PRITCHARD, J., and WELBORN, Special Judge.

ROBERT R. WELBORN, Special Judge.

Judgment of conviction and sentence to life imprisonment was entered on jury verdict finding Robert Louis Denson, Jr., guilty of murder in the first degree. Denson appeals.

On March 10, 1976, in an attempted robbery of the North Hills Bank in Clay County, Missouri, a bank guard, Warren Jackman, was shot and killed. The appellant was arrested and charged, along with others, under the felony murder statute. § 559.010, RSMo 1969. Inasmuch as the primary factual issue presented on this appeal is whether or not Denson's testimony warranted the submission of his defense of withdrawal from participation in the robbery, the factual recital is based primarily upon Denson's version of the incident.

According to Denson, in February, 1976, he was taken by Cardis Berry, an acquaintance whom Denson had known for the eight months following Berry's release from the penitentiary, to James Falkner's house "to talk about some easy money that I could get." Falkner asked Denson if he wanted "to go up on a bank robbery." "* * *

[H]e told me there was a bank over in North Kansas City coming right off the freeway, and that * * * there was no guard there and that it be a sure thing to get because there wasn't a guard in the place * * * He told me all I would have to do was collect money."

There were further meetings among Denson and other participants and Denson either tacitly or expressly agreed to participate. He was provided with a gun by Berry.

On March 10, Denson, Falkner, Steve Williams and Jerome Handley met at Falkner's and Falkner provided Williams with a 9 millimeter Luger and Handley with a sawed-off rifle. Denson did not bring his gun and he declined an offer of one because "* * * I wasn't going in there to shoot the place up or nothing." Falkner provided coveralls, ski masks and Playtex gloves for Williams, Handley and Denson. A green bag for the money was given to Denson. At around 10:00 A.M., vehicles carrying Denson, Handley, Williams, Falkner and others left Kansas City to carry out the robbery. Handley and Denson were in a stolen Buick which was to be used as the "clean" or getaway car. They parked it at Waterworks Park and got into a stolen Ford driven by Williams and the three proceeded to the bank.

Williams drove to the front of the bank and stopped the Ford. "They" said "Let's go." Denson got out of the car and ran toward the entrance to the bank. He went through two sets of double doors, entering the bank lobby about three or four feet. As he did so, he saw an officer sitting in a chair and Denson turned around and went back outside through the two sets of doors. As he got outside, either Handley or Williams was just entering the second door, into the lobby, with the other just behind him. Denson saw that Handley still had the sawed-off rifle.

Denson ran toward some apartments in the vicinity of the bank. About halfway up the hill to the apartments, Denson heard gunfire lasting about three minutes. He

removed his coveralls and gloves and noticed that a finger had been cut. He was uncertain as to how the injury occurred, but thought that he had broken the glass in the door as he left the bank.

Denson called a cab from a store and the cab took him to Mary Morris's apartment, where the group had gathered before the robbery to don their coveralls, and then to Falkner's apartment. Denson did not have money to pay for the cab and ran out on the driver. According to Denson, he took the cab back " * * * to see if any of them was hurt." "I went by myself on foot because I thought that Steven, Steve and Jerome must have knew that something was wrong for my reason of running back out, so I just went on and left them."

Falkner was picked up by the police at around 4:00 P.M. on March 10. By midnight, after a conference with the prosecutor who promised to recommend a 15-year sentence for Falkner, Falkner made a statement about the crime. Denson was arrested at around 1:00 A.M., March 11.

The nature of the issue here does not require recitation of the state's version of the affair, which included the testimony of Falkner. It is sufficient to observe that the state's witnesses at the scene of the robbery placed the three robbers in the bank at the time that the shooting started, and there was testimony that all three were armed.

The court gave three instructions on withdrawal by defendant, one applicable to each of the three verdict-directing instructions on felony murder, second degree murder and manslaughter. Appellant here attacks the instructions given as confusing, misleading, unclear and for their failure to define the burden of proof on the issue of withdrawal. There is no MAI–CR on withdrawal. See MAI–CR 2.10, Notes on Use, ¶ 6 b.

The state does not take issue with appellant's attack upon the instructions given, but contends that any deficiency therein is harmless error because, under the evidence, appellant was not entitled to go to the jury on a defense of withdrawal.

The defense of withdrawal has received little attention from the courts of this state. The new criminal code, effective January 1, 1979, recognizes and defines withdrawal as an affirmative defense to a criminal charge based upon concerted criminal action. § 562.041 2(3) and 3, RSMo 1978 Supp. Under this enactment, the defense is available to one who " * * * abandons his purpose and gives timely warning to law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense." That statute, not yet having become effective, does not provide the measure of appellant's conduct in this case.

The statute, insofar as it requires action on the part of the defendant to prevent commission of the offense, does reflect the holding of a prior case in this state. In *State v. Webb*, 216 Mo. 378, 115 S.W. 998 (1909), the defendant and a woman entered into a suicide pact and the defendant procured a pistol for the purpose of carrying out their design. The defendant changed his mind and had a long talk with the woman to dissuade her from the idea and the defendant thought that his effort had been successful. However, in the night, the woman shot the defendant, who survived, and then killed herself. Defendant was charged with manslaughter. § 559.080, RSMo 1969. At his trial the jury was instructed in effect that the defense of withdrawal should permit a finding of not guilty unless the deceased led defendant to believe that she had been dissuaded from carrying out the suicide pact and thereafter shot defendant and killed herself of her own volition. In holding that such requirement was erroneous, the court stated (115 S.W. 1001):

" * * * In effect we take it that this prosecution is based upon the theory of a conspiracy between the defendant and the deceased that each should commit suicide, and the instruction directs the jury in effect that although the defendant withdrew from the conspiracy before the suicide was committed by deceased, and although he endeavored to dissuade her from her purpose to kill herself, these facts did not excuse the

defendant from his previous agreement and advice to commit suicide, unless the deceased led the defendant to believe that she also had abandoned such idea, and then killed herself of her own volition. It is a general principle of the criminal law that, although several parties conspire to do a criminal act, there is a place of repentance, a locus penitentiae, so that, before the act is done, either one or all of the parties may abandon their design and thus avoid committing the criminal act. *United States v. Britton*, 108 U.S. [199], loc. cit. 205, 2 S.Ct. 531, 27 L.Ed. 698. This principle is familiar in the law of homicide. Thus it is said: 'Though a man should be in the wrong in the first instance, yet a "space for repentance is always open, and where a combatant in good faith withdraws as far as he can, really intending to abandon the conflict," and his adversary still pursues him, then, if taking life becomes necessary to save his own, he will be justified.' 1 Bishop's New Criminal Law, § 871; Horrigan and Thompson on Self-Defense, 227; 4 Blackston's Com. 184; *State v. Partlow*, 90 Mo. [608], loc. cit. 627, 4 S.W. 14, 59 Am.Rep. 31. The instruction seems to concede this principle of permitting the defendant to abandon his previous intention of committing suicide, and agreeing that the deceased should also do so at the same time; but this right is made dependent upon the fact that the deceased also abandoned her purpose to commit suicide, and led the defendant to believe in good faith that she had done so. It seems to us that this qualification of the right is not reasonable or based upon a sound principle. If there is anything in the doctrine of a space for repentance, it seems to us, when the defendant abandoned his purpose of committing suicide and endeavored to persuade the deceased to also abandon it, that he had done all that the law could exact of him. If, in spite of his announced intention to refuse to go further in the criminal purpose, and his persuasion and advice to also abandon such a purpose, the deceased proceeded to kill herself, then it was her own act, and one for which the defendant cannot, and ought not in any way, in our opinion, be held responsible, and

under the circumstances he could not properly be convicted of deliberately assisting her in the commission of self-murder."

In *State v. Bailey*, 383 S.W.2d 731, 734 (Mo.1964), the court quoted and applied the rule as stated in 22 C.J.S. Criminal Law § 89, pp. 267–268 (1961):

" * * * Where the perpetration of a felony has been entered on, one who had aided and encouraged its commission may nevertheless, before its completion, withdrawn all his aid and encouragement and escape criminal liability for the completed felony; but his withdrawal must be evidenced by acts or words showing to his confederates that he disapproves or opposes the contemplated crime. Moreover, it is essential that he withdraw in due time, that the one seeking to avoid liability do everything practicable to detach himself from the criminal enterprise and to prevent the consummation of the crime, * * * that, if committed, it be imputable to some independent cause."

That case was concerned primarily with the timeliness of the claimed withdrawal, it having been attempted only after a co-actor had broken into a building and the crime of burglary had been committed.

Timeliness was also involved in *State v. Forsha*, 190 Mo. 296, 88 S.W. 746 (1905), when the defendant, after having urged his co-actors to kill the victim, claimed to have departed before the fatal shot was fired. In holding that the defendant was not entitled to an instruction on withdrawal, the court said (88 S.W. 757):

" * * * We are unwilling to sanction as the law of this state that a defendant can first, by words and actions, put in operation a difficulty, or aid and abet in the commencement of it, and, after having by his course of conduct brought the principal actors into a deadly contest, that he can then flee from the scene of the struggle and thereby relieve himself absolutely from the results of such fatal difficulty. Such is not the law of this state, and the court very properly refused the instructions requested upon that subject."

Cases from other jurisdictions dealing with the timeliness of a claimed withdrawal are helpful. Thus in *People v. Nichols*, 230 N.Y. 221, 129 N.E. 883 (1921), defendant and Walker had entered a store to commit a robbery and both had drawn guns on the proprietor. When the proprietor resisted, defendant claimed to have fired a warning shot into the ceiling, said, "Come on Walker, get out of here," and left, leaving Walker in the store to fire the fatal shot. In rejecting the claim that an instruction on withdrawal should have been given, the court stated (129 N.E. 885–886):

"Whatever may be the other requirements of an effective abandonment of a criminal enterprise, it is certain both as a matter of law and of common sense that there must be some appreciable interval between the alleged abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. The process of detachment must be such as to show, not only a determination upon the part of the accused to go no farther, but also such as to give his coconspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result either of fear or even of a better motive, he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced, as in this case. While it may make no difference whether mere fear or actual repentance is the moving cause, one or the other must lead to an actual and effective retirement before the act in question has become so imminent that its avoidance is practically out of the question."

In *State v. Wilson*, 192 Neb. 435, 222 N.W.2d 128, 130[2] (1974), the court stated:

"To be effective as a defense, there must be an appreciable interval between the alleged abandonment of the criminal enterprise and the act for which responsibility is sought to be avoided. The coconspirator must have a reasonable opportunity to follow the example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme he has helped to devise and carry forward by running away at the instant when the act in question is about to be committed and the transaction which immediately begets it has actually been commenced."

In the present case, appellant's coconspirators were entering the bank pursuant to the robbery scheme as the claimed withdrawal of appellant was taking place. According to appellant, one of the coconspirators had entered the door to the bank lobby, with his weapon drawn. Appellant neither claimed to have made an effort to dissuade them from the planned criminal action nor to have communicated to them his intention to withdraw. Numerous cases in other jurisdictions have required some communication to coconspirators of the claimed withdrawal. See *People v. Brown*, 26 Ill.2d 308, 186 N.E.2d 321, 324[1, 2] (1962); *Commonwealth v. Mangula*, 2 Mass.App. 785, 322 N.E.2d 177, 181–182[8] (1975); *State v. Thomas*, 140 N.J.Super. 429, 356 A.2d 433, 441–442[9][10, 11] (1976). Withdrawal from the scene may in some circumstances be sufficient communication when coconspirators are aware of that fact (see *State v. Allen*, 47 Conn. 121 (1879)). Here, however, the timing of appellant's withdrawal would not permit the mere withdrawal to constitute the requisite communication.

Furthermore, appellant's own testimony negatived any withdrawal on his part. Following his separation from his coconspirators, he returned to the place where the criminal activity had begun, concerned about the safety of his fellow conspirators.

Under appellant's testimony, he was not entitled to have his defense of withdrawal

submitted to the jury. Therefore, any error in the form of the instructions submitted is nonprejudicial. Appellant had the benefit of instructions to which he was not entitled and is in no position to complain. *State v. Jackson*, 511 S.W.2d 771, 776–777[10] (Mo. 1974); *State v. Olinger*, 396 S.W.2d 617, 620–621[2, 3] (Mo.1965); *State v. Harper*, 386 S.W.2d 353, 355[6, 7] (Mo.1965).

Appellant's attack upon the constitutionality of Section 22(b) of Article I of the Constitution of Missouri, 1945, dealing with exemption of women from jury service, has been answered in *State v. Duren*, 556 S.W.2d 11 (Mo. banc 1977); cert. granted sub nom. *Duren v. Missouri*, 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978).

Appellant complains of the admission, over his objection that it was inflammatory, of a photograph of the interior of the bank, taken shortly after the robbers had departed and showing Officer Jackman lying on the floor with blood on him and his clothing from his wounds. The appellant had previously made a judicial admission that Officer Jackman was killed and that the cause of death was hemorrhaging and excessive loss of blood from gunshot wounds. Appellant contends that the photograph had no probative value on any controverted issue in the case and that it was offered only to inflame the jury.

This photograph shows not only Officer Jackman. It also depicts at least one of the state's witnesses, who identified the photograph, a bank employee, and the interior of the bank in the vicinity of the body. A photograph of the body of a homicide victim is not per se inadmissible as inflammatory. *State v. Parker*, 509 S.W.2d 67, 70[1, 2] (Mo.1974). Even though it depicts matters otherwise shown by oral testimony, the photograph is admissible if it throws light on any issue in the case. A photograph is admissible if it enables the jury better to understand the testimony of a witness or if it tends to corroborate, explain or clarify the testimony of a witness. *State v. Stevens*, 467 S.W.2d 10, 24[16–18] (Mo.1971); *State v. Johnson*, 486 S.W.2d 491, 494–495[1, 2] (Mo.1972); *State v. Par-*

*ker*, supra; *State v. Love*, 546 S.W.2d 441, 451–452[10, 11][12, 13] (Mo.App.1976). A considerable discretion is vested in the trial court in determining whether or not the probative value of a photograph outweighs the possible inflammatory effect of its picturing the body of the homicide victim. *State v. Parker*, supra. Here, the photograph did depict the scene of the crime and showed the presence of the state's eyewitness. In that regard it did corroborate the witness's testimony. The photograph does not focus upon the body of Officer Jackman and it clearly is not the type of photograph described in *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), (a body in an advanced state of decomposition), or in *State v. Robinson*, 328 S.W.2d 667 (Mo.1959), ("extremely obscene, offensive, vulgar, horrid and repulsive," 328 S.W.2d at 671), relied upon by appellant.

The admission of the photograph in this case has not been shown to have been an abuse of discretion on the part of the trial court.

Judgment affirmed.

All concur.