THE STATE v. ANTONE W. KOCH, Appellant.—16 S. W. (2d) 205.

Division Two, March 2, 1929.

*Earl E. Roberts, James Booth, Virginia Booth* and *William P. Elmer* for appellant.

*Stratton Shartel,* Attorney-General, and *Hibbard C. Whitehill,* Special Assistant Attorney-General, for respondent.

110

HENWOOD, C.—By an indictment returned and filed in the Circuit Court of Crawford County on February 20, 1926, defendant was charged, in the first count, with arson, and, in the second count, with aiding and abetting one Mitchell in committing arson. These charges related directly to the setting fire to and burning the store building of J. J. and Mary E. Bremer, located in the town of Bourbon, in Crawford County. The venue was changed to the Circuit Court of Dent County, and, upon trial in that court, defendant was found guilty as charged in the second count, and his punishment assessed at imprisonment in the penitentiary for three years. He was sentenced accordingly, and appealed.

Evidence offered by the State tends to show that, at the time in question, J. J. and Mary E. Bremer were the owners of a one-story brick building, with a one-story and a two-story frame addition thereto, which was located on the south side of Main Street and in the business section of the town of Bourbon, in Crawford County, and in which they conducted a hardware store. On the north or opposite side of Main Street, and on the third lot west, defendant owned a one-story brick building, in which he conducted a garage and also had his sleeping quarters. On the same side of the street and forty

feet west of defendant's garage, George Merkel's two-story frame dwelling house was located. Thirty feet west of the dwelling house, stood the flour mill building of John and George Merkel, which consisted of a three-story frame building, covered with sheet-iron on the roof and sides, and a basement. And twenty-eight feet west of the mill, the Merkels had a steel storage tank, containing 9,000 gallons of kerosene. About four o'clock on Saturday morning, October 19, 1924, fire was discovered in the rear part of the Bremer store building, where oil appeared to have been poured on some rubbish, though there was no fire in any other part of the building. At the same time fire was discovered under the corn-chute in the basement of the Merkel flour mill, in the southwest corner, though there was no fire in any other part of that building. A general fire alarm was given, the inhabitants were aroused and attempted to put out these two fires, but, for want of adequate fire-fighting apparatus, the Bremer store building and contents, the Merkel flour mill and contents, and other buildings, were totally destroyed before the spreading flames could be extinguished. The total loss to the Bremers was $18,000, and the total insurance of $5,000 was collected. The Merkels suffered a total loss of $60,000, and collected their total insurance of $16,000. The dwelling house of George Merkel and defendant's garage building were saved. Defendant had always kept one or two barrels of water on the roof of his garage for fire protection, but, about three weeks before the fire, three extra barrels were observed there, when they were being filled with water by some of defendant's employees. Two or three days before the fire, defendant bought eight pieces of sheet-iron, seven feet long and twenty-six inches wide, at Bremers' store, and a day or two before the fire, defendant was seen while placing pieces of this sheet-iron over the four west windows of his garage, next to the George Merkel residence. Soon after the fires were discovered, it was noticed that defendant was engaged in nailing or fastening these pieces of sheet-iron over the west windows of his garage. Defendant had bought some pieces of the same kind of sheet-iron at Bremers' store in the spring of 1924. He traded at their store before the fire, and made a voluntary settlement of his account about six weeks after the fire.

Henry L. Mitchell had lived in Bourbon for several years, prior to the fire, and while there was engaged in the drayage business. He was a customer and a frequent visitor at defendant's garage. In June or July, 1923, he moved to St. Louis. Mitchell testified that, in July, 1924, he received a letter from defendant, signed "Tony," and addressed to him (Mitchell) at 909 Tyler Street, saying: "I am writing you this letter to know if this is your correct address. I have some business I want to see you on, so answer if this is the correct address, and I will see you in a few days." He burned this letter at

defendant's request, and answered it "right off." About one week later, on Sunday morning, defendant came to his house, and they took a walk. Defendant asked him to burn the Bremers' hardware store and the Merkels' flour mill; said he would pay him (Mitchell) "fifty dollars" for the burning of these buildings, that "it was easy money, and I might as well have it as anybody; it had to be done and I might as well have it as anybody." Defendant also said: "Those people are just too smart and had to be brought down, and that was the only way to bring them down; that if you go to working on a man's property, that will bring him down." He (Mitchell) refused at first, but, after they had several drinks of "home brew" in different saloons, he finally agreed to "take the job." Defendant, upon leaving, said he was going over in Illinois to see some relative, and would see him (Mitchell) "on his way back;" if not, he would be in St. Louis again in a few days and "make arrangements for burning these buildings." A couple of weeks after that, defendant came to his (Mitchell's) house again, and he told defendant he "had backed out on the job." Defendant said he had made all arrangements and was depending upon him; said "he had oil hid in the culvert out by Mrs. Oel's, also had barrels on his roof and hose connected and everything ready," and he finally told defendant he "would be out the following Saturday night." And defendant said he (Mitchell) "had better get a car, could get away easier with a car." He (Mitchell) asked Fred Hood to take him in his (Hood's) car, but Hood refused, and he (Mitchell) "didn't go either." About the middle of August, he received another letter from defendant, unsigned, but in defendant's handwriting. In this letter, defendant asked Mitchell to meet him at Union Station in St. Louis on Sunday, on arrival of "No. 8," running as an excursion train that day. He burned this letter also. He saw several other Bourbon people get off of that train, and met defendant later, "back from the gates, a little ways in the corridor." He refused again "to do the job," and defendant said that "he couldn't hire anyone else to do this job, that there was too many knew about it now, and that he had depended on me and he had all the arrangements made." He thought he told defendant, in reply, that he "would come out," but was not positive as to his reply. About the first of October, defendant came to his house again and asked him about burning the buildings. He said "to be sure and come out and take care of the job *because he (defendant) couldn't get any money until the job was completed* and he had already spent too much money coming back and forth to St. Louis to see me, and if I was coming, he wanted me to come right away." He told defendant he would be out the following Saturday night, but did not go, and wrote a letter to defendant. The prosecuting attorney, at this point, called upon defendant to produce the letter, and defendant's counsel said: "I haven't the letter, I don't know anything about it."

Over defendant's objection, the witness was then permitted to testify as to the contents of the letter, as follows: "I wrote him and told him I would be out the following Saturday night." He did not go at that time, but did go on the Friday after that, the night of the fire. He bought a railroad ticket from St. Louis to Sullivan because the train did not stop at Bourbon, and walked six miles, from Sullivan to Bourbon. He reached Bourbon about three o'clock Saturday morning. He went to the culvert mentioned by defendant, and found a gallon bottle and a half gallon fruit jar full of oil, in a burlap sack and hid under the culvert. He left the oil there at that time, and, from a point across the street from defendant's garage, he aroused defendant by throwing a couple of rocks against the garage door. He did this, at defendant's suggestion, to avoid the possibility of being tracked to the garage by hounds. He told defendant he had come to see his father, who lived at Bourbon, and not to burn the buildings. Defendant said "he had everything ready and now was as good a time to pull it as any time." After they took a drink of whiskey, he told defendant to get everything ready, he would go ahead and do the job. Defendant handed him a "thirty-eight revolver" for protection, pliers with which to open the lock on the oil tank, a bottle of whiskey to drink "after awhile." He went back to the culvert and got the oil, and poured the oil out of the gallon bottle on the excelsior and boxes in the rear of Bremers' store; went across the street and twisted the lock on the oil tank, but could not open it and let the oil out; went into the basement of Merkels' flour mill, and, after pouring oil on the corn-chute and some empty sacks there, set them "afire;" and then went back to Bremers' store and "set fire to this oil and excelsior there." After setting fire to these two buildings, he fled back toward St. Louis, walking along the railroad, through the woods, and along the public road, to St. Clair, where he first went to the home of Fred Hood's father, and then boarded a train, on which he rode to St. Louis. He "hung" the pliers on a bush in Fritz Werner's pasture, defendant having told him to destroy them because they had defendant's initials on them, and hid the revolver along the railroad right-of-way east of Acid, a station on the railroad. About a week after the fire, he met defendant at Union Station in St. Louis and defendant paid him fifty dollars "for burning the mill and hardware store." About two weeks after the fire, he and Fred Hood drove in Hood's car to the home of Hood's father, and then they drove, the next morning, to the place where he left the gun, and found it there. He took the gun home, and, later, sold it to Paul Coulter, a roomer at his house. He further said that he had been in the penitentiary since February, 1926. He identified the Colts pistol—38 caliber, shown to him by the prosecuting attorney, as the pistol defendant gave him the night of the fire, and which he

later sold to Paul Coulter. On cross-examination, he said the sheriff of Crawford County brought him from the penitentiary to attend the trial. His wages averaged $45 per week. He admitted that, while defendant was town marshal or constable several years before the fire, defendant arrested him for drunkenness and put him in jail; that he cursed defendant while in jail, but did not remember whether or not he said he would get even with defendant, though the people told him he said that. He also said, at the trial: "He caught me drunk and I give him credit for doing his duty." On re-direct examination, he testified, without objection, that he got whiskey at defendant's garage on the occasion he was arrested for being drunk. On re-cross-examination, he admitted that he stole a bottle of whiskey out of a car defendant was working on, at the time he was arrested for drunkenness.

Mitchell's wife corroborated him as to the letters received from defendant and their contents, and as to defendant's visits at their house.

Arthur Pratt testified that he had known defendant for about eight years, and, over the objection of defendant, he was permitted to testify further, that, after defendant's arrest on these charges, defendant met him in the barber shop in Bourbon and told him "not to tell anything;" and, later at defendant's garage, defendant said: "You don't want to get shot, do you?" And defendant also told him that "nobody better testify against him, he would throw five gallons of gasoline on them and touch a match to it." On cross-examination, defendant's counsel asked him: "What did you know at that time that you could have told?" Then, without getting an answer to that inquiry, he was cross-examined as to his testimony in a former trial against defendant, when he said he knew nothing to tell against defendant. On re-direct examination on this matter, he said that, previous to the fire, "we (he and defendant) talked about doing some burning." On re-cross-examination, he said he did not tell that at the former trial because the prosecuting attorney "wouldn't let" him tell it. He was later recalled by defendant for further cross-examination, and, on re-direct examination, he testified, over defendant's objection, that one night before the fire, defendant said to him: "I got a job of burning I want done, about thirteen miles from town; this job will pay fifty dollars; and when that job is done, there will be a few more little jobs in town that will be only twenty-five-dollar jobs. We will give you a good gun and the first man you see, you don't take no chance on it, you want to shoot him." On re-cross-examination, he said he told Lloyd Missey about that conversation with defendant; that he had told the prosecuting attorney about it, and, when he started to tell about it at the former trial, "they stopped" him. At this point, the prosecuting

attorney agreed that the testimony given by this witness at the former trial could be read in evidence without further inquiry or identification.

Jesse Pratt testified that Roy Pratt was his cousin and Allie Pratt his brother, but he did not know where his brother, Allie Pratt, was at the time of the trial. In the summer of 1924, he brought a 38-caliber Colts pistol to Bourbon and gave it to his brother, Allie Pratt, in exchange for a 44- or 45-caliber pistol. He got the 38 pistol from his cousin, Roy Pratt, and returned the 44 or 45 pistol to him. He never saw the 38 pistol again after delivering it to his brother in Bourbon. He was shown the same 38-caliber Colts pistol that was shown to Mitchell, at the trial. He said the pistol exhibited at the trial was the same kind, in make and in caliber (38-Colts), that he delivered to his brother, but could not say positively that it was the same pistol.

Other witnesses for the State, residents of Bourbon, testified that they saw defendant on the excursion train en route to St. Louis in the summer of 1924. The State offered in evidence the pistol identified by Mitchell, and partially identified by Jesse Pratt, and the same was handed to the jury for their inspection.

Defendant testified at length in his own behalf. He said he did not see Mitchell from the time he (Mitchell) left Bourbon in 1923 until sometime in 1925; that he wrote Mitchell no letters, made no trips to St. Louis to see him, and made no arrangements with him nor with anyone else for the burning of the buildings in question; that he had no conversation with Arthur Pratt, concerning the burning of these buildings, either before or after the fire. He further testified that he had always kept the barrels of water on the roof of his garage for fire protection, and that, from time to time, old barrels were replaced with new ones, and that there had been no barrels put on the roof since the roof was tarred in April, 1924; that he bought eight pieces of sheet-iron at Bremers' store in September, but none since that time; that these pieces of sheet-iron were to be used in the construction of a coal shed which had not been completed at the time of the fire; that Lee Bell, the mail carrier, "woke" him at the garage and told him about the fire; that, then, he put two pieces of sheet-iron over each of the four west windows of his garage to protect his building from the fire at the flour mill, and that none of these pieces of sheet-iron had been put over these windows prior to the fire. And he further testified that, while acting as constable in December, 1921, he arrested Mitchell for drunkenness, and put him in jail; that Mitchell did "considerable cussing" and said he would "get even" with him (defendant); and that, after Mitchell was arrested, he heard that a bottle of whiskey had been stolen from a car in his garage, on that day. On cross-examination, he admitted that he went to St. Louis on the Sunday morning excursion train in

August, 1924, and said he went on to East St. Louis to see his aunt; and he admitted that he traded with Allie Pratt a 45-caliber pistol for a Colts pistol in the summer of 1924, but did not remember whether the Colts pistol was a 32- or 38-caliber, nor whether he testified at a former trial that it was a 38-caliber pistol. He was also cross-examined, without objection, as to whether he was an officer of the law at the time he saw two bottles of liquor in a customer's car at his garage, and as to whether he left the bottles of liquor in the car after he saw them there. He said the bottles contained "sort of red" liquor, but he "couldn't swear what was in them," and that he left the bottles in the car because he "didn't have no business to do anything with them." On re-direct examination, he said he carried a pistol when waiting on customers at the gasoline filling station at night and kept a pistol under his pillow, and that the Colts pistol he got from Allie Pratt was stolen from under his pillow one morning, about the first of October, 1924, while he was away from his garage.

In corroboration of defendant's testimony, Fred Hood said that Mitchell did not say anything to him about going to Bourbon to burn any buildings, and that he was not asked by Mitchell to take him to Bourbon in his car. He admitted, on cross-examination, that, while he and Mitchell were on a hunting trip in the neighborhood of Acid station, in November, 1924, he "heard" that Mitchell "got something," and also "heard" that the pistol had been hidden there. Lee Bell said he "called" defendant at the garage about four o'clock on the morning of the fire, and that defendant "answered" him. The witnesses Clyde Adams and Fred Harras said they heard Mitchell say, while he was in jail, that he would "get even" with defendant for arresting him. William Adams said Arthur Pratt told him, before the first trial, that he knew nothing to tell against defendant. Other witnesses said that, at the time of the fire and prior thereto, defendant had under construction a coal shed, at the rear of his garage, and that sheet-iron was to be used in completing the sides and roof of the coal shed.

The transcript of Arthur Pratt's testimony at the former trial was read in evidence, showing that, at that trial, Arthur Pratt testified, on cross-examination, that he "didn't know anything" to tell against defendant. Defendant also offered in evidence a certified copy of the record of the Circuit Court of Crawford County, showing that, on February 20, 1926, Mitchell pleaded guilty to a charge of arson, that is, of setting fire to and burning the Bremers' store building, and that he was sentenced to imprisonment in the penitentiary for three years as punishment therefor.

Several of defendant's witnesses testified that he had a good reputation for law-abiding citizenship, and that both Mitchell and Arthur

Pratt had bad reputations for truth and veracity and for honesty and morality.

I. It is contended that the trial court erred in permitting counsel for the State to ask members of the jury panel, on their *voir dire* examination, if they had ever been members of the organization known as the Ku Klux Klan. This complaint is based upon the assumption that none of the jury panel had ever been affiliated with the Ku Klux Klan, and that they inferred from this inquiry that defendant was or had been a member of that organization, and were thereby prejudiced against him.

The record merely shows that Frank Smith, one of the jurors, was asked this question and answered "no," and that each of the other jurors "was asked" this question. What the answer of the other jurors was, does not appear, and we find nothing in the record to support the contention that the jury were prejudiced against defendant by this incident. The trial judge heard and observed everything that was said and done in connection with this and all other incidents of the trial, and we see no basis for the conclusion that he abused his discretion, either in overruling defendant's objection to this inquiry or in overruling defendant's motion for a new trial on that ground. Speaking generally, counsel have the right to interrogate jurors, on their *voir dire* examination, as to their membership in or affiliations with any organization, and where, as here, there is no showing of improper motives on the part of counsel nor of prejudicial effect on the minds of the jurors, no error is committed in permitting such inquiries. [See Sec. 6632, R. S. 1919; State v. Craft, 299 Mo. 332, 343, 253 S. W. 224; State v. Griffith, 279 S. W. 135, 137.]

II. Various complaints are made by defendant as to evidence admitted on behalf of the State.

(a) Among these, are the complaints that the court erred in permitting Mitchell to testify that he got a bottle of whiskey out of a car at defendant's garage on the day he (Mitchell) was arrested for drunkenness, and in permitting counsel for the State to cross-examine defendant as to whether he was an officer of the law at the time he discovered two bottles of liquor in a customer's car at his garage, and also as to whether he (defendant) left the bottles of liquor in the car after he discovered them.

As indicated in the above recital of the evidence, the record shows no objection, either to the testimony of Mitchell or the cross-examination of defendant in these particulars. Such complaints are, therefore, of no avail on this appeal.

(b) It is also charged that the court erred in permitting Mitchell to testify as to the contents of a letter which he said he wrote and mailed to defendant.

The record shows, as above indicated, that Mitchell was not permitted to testify concerning the contents of the letter in question until after counsel for the State called upon defendant, at the trial, to produce the letter, and defendant's counsel said: "I haven't the letter, I don't know anything about it." It may be conceded, as defendant contends, that he could not be compelled to produce evidence against himself, and that he would be entitled to a reasonable opportunity to produce any document in his possession, if he so desired, before parol evidence would be admissible to show the contents of such document. But, defendant said he did not have the letter and knew nothing about it. Under these circumstances, a formal notice to produce the letter and further time to consider the State's demand for the letter could not have served any purpose, and, for that reason, no error was committed in admitting Mitchell's testimony as to the contents of the letter. [16 C. J., 616-617, and authorities therein noted.] Moreover, such testimony, to the effect that Mitchell merely stated in the letter to defendant that he (Mitchell) "would be out (to Bourbon) the following Saturday night," in view of other evidence in the case, can hardly be said to have been prejudicial.

(c) It is very seriously urged that the court should have excluded the testimony of Arthur Pratt relating to conversations with defendant before the fire in question and after defendant's arrest on this charge.

As shown above, this witness first testified that defendant told him, after defendant's arrest, "not to tell anything," and that "nobody better testify against him, he would throw five gallons of gasoline on them and touch a match to it." Then, after being pressed both on cross-examination and re-direct examination as to what he knew to tell, he said, on re-direct examination, that, before the fire, "we (he and defendant) talked about doing some burning." And then, after being recalled for further cross-examination, he said, on re-direct examination, that, before the fire, defendant said to him: "I got a job of burning I want done, about thirteen miles from town; this job will pay fifty dollars; and when that job is done, there will be a few little jobs in town that will be only twenty-five-dollar jobs. We will give you a good gun and the first man you see, you don't take no chance on it, you want to shoot him."

The testimony of this witness relating to conversations with defendant after defendant's arrest, that is, that defendant told him "not to tell anything," and threatened violence to anyone who testified against him, was clearly admissible as statements and admissions

made by defendant against his interests. And the further testimony of this witness relating to conversations with defendant before the fire was invited by defendant, when his counsel asked the witness, on cross-examination:. ''What did you know at that time that you could have told?'' After so inviting such testimony, defendant cannot now be heard to complain about it. Defendant now contends that it should have been excluded because it related to a solicitation by defendant of this witness ''to commit other arsons not connected with the charge in this case.'' Aside from defendant's invitation of this testimony, it was competent for other reasons. It was not only explanatory of defendant's statements and admissions against his interests, in requesting this witness ''not to tell anything'' and in threatening violence to anyone who tetified against him, but was competent, in connection with other evidence in the case, because it tended to show that the fire in question was of incendiary origin, and because it tended to show motive and intent and a common scheme or plan, on the part of defendant, for the commission of two or more crimes of the same character, including the one for which defendant was being tried. [16 C. J. 593; State v. Hyde, 234 Mo. 200, 224, 136 S. W. 316.]

III. Defendant further complains of the action of the trial court in refusing to give his Instructions B, C and D.

By defendant's Instruction B, if given, the jury would have been instructed that ''*the State has failed to prove any motive on the part of defendant to commit the crime charged against him,*'' and that ''the failure to prove such motive is a fact in defendant's favor to be weighed and considered by you in determining his guilt or innocence.'' (Our italics.) This instruction was properly refused. There is direct evidence in this case tending to show motive, but, even in the absence of such evidence, and in a case of purely circumstantial evidence which fails to disclose any motive for the offense charged, where the question of motive becomes a matter of important inquiry and legitimate argument, the presence or absence of motive is a fact to be determined by the jury, and not by the court. Manifestly, the court would have determined this question by instructing the jury that ''the State has failed to prove any motive,'' as it was requested to do by the offer of this instruction. The court did not instruct on motive in this case, and it was not necessary to do so because the question of motive was merely one of the many circumstances to be considered by the jury, and was not conclusive of defendant's guilt or innocence. [State v. David, 131 Mo. 380, 396, 33 S. W. 28; State v. Foley, 144 Mo. 600, 620, 46 S. W. 733; State v. Santino, 186 S. W. 976, 977.] In the face of direct evidence tending to show motive, defendant could not have been benefited by a

special instruction calling attention to the question of motive. Under such circumstances, the failure of the court to instruct the jury on motive was not prejudicial error, although it may be said that defendant requested such an instruction by the offer of an improper instruction on that question. [State v. Aitken, 144 S. W. 499, 503.]

Defendant's Instruction C, on the credibility of witnesses and the weight and value to be given to their testimony, related to matters which were fully and properly covered by the State's given Instruction 7. It follows that no error was committed in the refusal of defendant's Instruction C, on the same subject.

Defendant's Instruction D reads as follows:

"The court instructs the jury that *mere verbal statements* of the defendant, if you find that he made *any such statements*, should be considered by you with caution, on account of the liability of *the defendant not clearly expressing himself and the witness misunderstanding what was really said or intended.*" (Our italics.)

An instruction of that character was not necessary for the information of the jury in giving their verdict, and therefore, the court was not required, by the statute, to give such an instruction of its own motion. [Sec. 4025, R. S. 1919; State v. Mulconry, 270 S. W. 375, 378; State v. Reich, 239 S. W. 835, 838.] Moreover, by defendant's given Instruction 5, the jury were told, in effect, that they should receive the testimony of the accomplice (Mitchell) with great caution, and they should be fully satisfied of its truth, and that it established the guilt of defendant beyond a reasonable doubt, before convicting upon such testimony. In view of the giving of this cautionary instruction as to the testimony of the accomplice (Mitchell), and the State's Instruction 7, relating to the credibility of all witnesses and the weight and value to be given to their testimony, the refusal of defendant's Instruction D, above quoted, was not error; nor was it the duty of the court to give any additional cautionary instruction by reason of the offer of defendant's Instruction D.

IV. Finally, it is contended that the court erred in interrupting the argument of defendant's counsel to the jury, and in correcting counsel's interpretation of defendant's given instruction on the rule of reasonable doubt; and it is further contended that such action on the part of the court was prejudicial to the defendant.

The proceedings in connection with this matter are scattered over several pages of the record, and we see no occasion for quoting such proceedings in this opinion. As indicated, the instruction in question was requested by defendant, and, certainly, he is not in a position to complain about the court's failure to define the term "reasonable doubt," or anything else concerning his own instruction. However,

the instruction is in approved form, and, as stated by the court, in commenting on the instruction and counsel's argument relating thereto, the "ordinary man understands" what is meant by the. term "reasonable doubt." For that reason, it was entirely unnecessary for the court or counsel to define that term. The record shows that counsel, in his argument to the jury, undertook to give the term "reasonable doubt" a broader meaning, and to attach to it greater significance, than was intended by the ordinary use of that term in the instruction. In that situation, it was not only the right but the duty of the court to interrupt him, and to prevent him from making an improper argument in his interpretation of that instruction. We think the action of the court in this whole matter was eminently fair and proper.

In the foregoing discussion, we have disposed of all complaints considered in defendant's brief, and referred to in the oral argument of his distinguished counsel before this court. We find no merit in other assignments of error which were properly preserved for our review. The jury were fully and fairly instructed on all questions of law arising in the case, and the evidence is amply sufficient to support their verdict. After a careful examination of the entire record, we are convinced that defendant was accorded a fair and impartial trial. The judgment is accordingly affirmed. *Higbee, C.,* concurs; *Davis, C.,* dissents.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.