**STATE of Missouri, Respondent,**

v.

**Daniel STEVENS, Appellant.**

**No. 55295.**

Supreme Court of Missouri,
Division No. 2.

April 12, 1971.

Motion for Rehearing or Transfer to Court En Banc Denied May 10, 1971.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Shaw & Howlett, Charles M. Shaw, Clayton, for appellant.

STOCKARD, Commissioner.

Appellant was convicted of second degree murder, and when the jury could not agree on the punishment, the court assessed and declared the punishment at life imprisonment. We affirm.

About 1:30 o'clock of the afternoon of November 25, 1968 a nephew of Mrs. Elizabeth Abbott discovered her partially nude body on the floor of her home at 233 Dennison, Ballwin, Missouri. She had been beaten repeatedly over the head with a

six-pound metal barbell designed for exercise purposes.

On July 31, 1969 an indictment was filed in which appellant was charged with the murder of Mrs. Abbott. At the time of the murder appellant was fourteen years of age, and was subject to the provisions of Chapter 211 (all statutory references are to RSMo 1969, V.A.M.S.), the Juvenile Code. The transcript before us does not so show, but presumably the Juvenile Court determined that appellant was not a proper subject to be dealt with under the Juvenile Code and that he should be prosecuted under the general law. There is no challenge on this appeal to such prosecution.

We will state generally the circumstances which led to the arrest of appellant and certain subsequent events and circumstances, and will set forth such additional facts deemed advisable in the discussion of the contentions presented on this appeal.

Appellant was a next door neighbor to Mrs. Abbott, and on the day of the crime had remained away from the Crestwood Junior High School because his younger brother was ill. The day following the crime, investigating police officers found in a multiflora rosebush near appellant's residence a pair of gloves and also a yellow shirt of the same size and same brand name of a blue shirt which belonged to appellant. He admitted he had a pair of gloves and shirt similar to those found, but said he had thrown the shirt in a trash can the morning of the murder, and that several days earlier he had lost the gloves at school. Stains on the shirt and on one of the gloves were of human blood Type O. The deceased's blood was Type O, and appellant's blood was Type A positive. The barbell was found lying next to the body of the deceased. On it there were fabric or glove impressions but no fingerprints. Strands of hair found on the right hand glove were submitted to a neutron activation analysis. One was found to have come from appellant and the other from the deceased.

About two o'clock of the afternoon of the day following the murder Police Officers Zimmerly and Binggeli talked to appellant in the principal's office at school. Officer Binggeli noticed a spot on the insole of his right shoe. With appellant's permission he took a scraping of it, and he also scraped some material from beneath appellant's fingernails. A chemical analysis showed human blood in the shoe scraping, but because of the insufficiency of the sample the type could not be determined. The fingernail scrapings showed the presence of blood, but again due to the insufficiency of the sample it could not be determined that it was human blood. Appellant was placed under arrest about five o'clock of November 26, and was immediately delivered by the police officers to the St. Louis County Juvenile Detention Center.

By appellant's points IV and XI he asserts that prejudicial error resulted when the court permitted Dr. Varkey Phillip to testify that at the request of the police he had taken a sample of blood from appellant, and in admitting into evidence Exhibit No. 58, the report of the analysis of appellant's blood which showed it to be Type A positive. The basis of the contentions is that although appellant was represented by counsel at the time the blood sample was extracted, counsel was not notified and was not present. Appellant relies on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and he attempts to distinguish Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

Apparently recognizing that Schmerber v. State of California, supra, has laid to rest as without merit the contentions that the taking in a reasonable and medically accepted manner of a blood sample from a person under arrest violates due process or the privilege against self-incrimination, or constitutes an unreasonable search and seizure, appellant seeks to equate the factual situation here to that in Massiah v. United States, supra. In that case, with

the cooperation of a co-indictee, federal authorities listened unbeknownst to defendant to a conversation between defendant and the co-indictee, and incriminating statements of defendant so overheard were introduced in evidence. It was held the accused was "denied the basic protections of [the Sixth Amendment, that 'In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence'] * * * when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." Subsequently in the opinion, the court again emphasized that all that was ruled in that case was that "the defendant's own incriminating statements, obtained by federal agents under the circumstances * * * could not be used by the prosecution as evidence against *him* at his trial."

It was subsequent to the Massiah case that the Supreme Court of the United States decided the Schmerber case. There, in discussing the claim that the compulsory taking of a blood sample violated the protection of the Fifth Amendment against an accused being compelled to be a witness against himself, the court quoted from Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021, that " '[T]he prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." It was then stated in the Schmerber case that "It is clear that the protection of the privilege [against being compelled to be a witness against himself] reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. * * * On the other hand, both federal and state courts have usually held that it offers no protection against compulsion

to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." The court then held that the taking of a sample of blood, even when without the consent of the defendant, did not involve "even a shadow of testimonial compulsion upon or enforced communication by the accused * * * either in the extraction [of the blood sample] or in the chemical analysis." The court then considered the claim that in compulsorily taking the blood sample, the accused's Sixth Amendment right to the assistance of counsel was violated. It held that its conclusion as to the claim of being compelled to be a witness against himself "answers" the claim that he was denied the right to counsel within the scope of the Sixth Amendment, but it was added that "No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented." We consider that the Schmerber case rules the contention of appellant except insofar as it is premised on the absence of counsel at a *critical stage* of a criminal proceeding, a contention not specifically asserted in the point but presented in argument, and the Schmerber case apparently left open that question.

■ Appellant does not cite or rely on cases such as United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, which hold that by reason of the Sixth Amendment a postindictment lineup is a critical stage at which an accused is entitled to have counsel present. However, in the Wade case, after ruling that a lineup is a critical stage the court commented on the argument that a lineup is merely a preparatory step in gathering evidence such as "systematized or scientific analyzing of the accused's fingerprints, blood sample,

clothing, hair, and the like." The court said: "We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial." This reasoning would apply to the stage of withdrawing the blood sample as well as the analysis of the sample. We find no prejudicial error in the admission in evidence of the testimony of Dr. Phillip and of Exhibit No. 58.

■ By his points VIII and IX appellant asserts that prejudicial error resulted from the admission in evidence of Exhibit No. 43 and Exhibit No. 51.

Exhibits 43 and 51 were envelopes in which fingernail scrapings taken from appellant had been placed. Apparently the envelopes were offered in evidence to show the method of safekeeping and control until the scrapings were delivered to the chemist for analysis. Appellant's argument in his brief is on the basis that the exhibits consisted of the scrapings or the report of the chemist, and apparently the objection is also to any testimony concerning the taking of the scrapings and the result of the analysis by the chemist. We shall consider the scope of the point to extend to those matters. The basis of the contention, as so broadened, is that the scrapings were taken while appellant was in custody of the police, and while he did not have the benefit of counsel "who could observe the manner in which [the scrapings were] obtained and what [they] looked like at the time * * * and [who] could observe the [appellant], his actions and emotional responses to the removing of the [scrapings]."

What we have said concerning the withdrawal of a blood sample applies equally to the taking of the fingernail scrapings. Appellant cites only the two cases, Massiah v. United States, supra, and Schmerber v. State of California, supra, which were cited and relied on in support of the previously ruled points IV and XI. We need not repeat what has previously been said in ruling those two points. That ruling governs the contentions here made.

By his point X appellant asserts that prejudicial error resulted from the admission in evidence of Exhibit No. 52 because it was "immaterial and irrelevant to the issues in the case." He cites Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646.

This point pertains to the scrapings of the spot on appellant's shoe taken by the police officer at the office of the school principal, which was before arrest. This exhibit, as the two previously discussed, was the envelope in which the scrapings had been placed. We treat the point, however, as encompassing the testimony concerning the taking of the sample and of the result of the analysis by the chemist.

■ Appellant merely asserts that the exhibit was immaterial and irrelevant without specifying any reason and without discussion. This was not the objection at trial. There appellant objected to the testimony concerning the taking of the scrapings on the ground that they were obtained "in violation of defendant's immunity against unreasonable search and seizures, and * * * giving evidence against himself." Although those reasons are not now advanced on this appeal, Schmerber v. State of California, supra, results in the objections made at trial being

without merit. The objection now advanced, assuming it had been preserved for appellate consideration, also is without merit. Evidence of blood stains on the person or clothing of an accused in a prosecution involving violence to the person is relevant to the issue of guilt. State v. Kern, Mo., 447 S.W.2d 571; 40 C.J.S. Homicide § 215d. In addition, even if we should assume that the evidence of the taking of the scrapings and of the result of the test was immaterial, "it is generally true that 'the admission in evidence of facts entirely immaterial to the issues and without probative force cannot constitute prejudicial or reversible error,' especially when the facts evidenced are of such character that they do not have a natural tendency to inflame or arouse hostile passions and their prejudicial effect is not otherwise made to appear." Hungate v. Hudson, supra. However, in the Hungate case the prejudicial effect was demonstrated, but in this case appellant makes no attempt to demonstrate prejudice.

Appellant's point II is that the trial court erred in admitting into evidence statements made by appellant "concerning certain shirts and gloves." Neither in the point nor in the argument in the brief does appellant set out the statements. However, we conclude that reference was intended to statements of appellant that he had a pair of gloves and a shirt similar to those found by the police officers, and that he had thrown the shirt away and had lost the gloves. Appellant asserts that the admission of these statements was error because (1) he did not waive his right to counsel, and (2) they were not admissible under the rules announced in State v. Arbeiter, Mo., 408 S.W.2d 26, and State v. Arbeiter, Mo., 449 S.W.2d 627.

In support of his first reason, appellant cites State v. McGee, Mo., 447 S.W.2d 270, which quoted from Miranda v. State of Arizona, 382 U.S. 925, 86 S.Ct. 320, 15 L. Ed.2d 338, as follows: "Presuming waiver [of counsel at custodial interrogation] from a silent record is impermissible. The record

must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

During the testimony of Police Officer Gockel, who was one of the officers present when appellant made the statements concerning the gloves and the shirt, counsel for appellant requested and was granted an interlocutory hearing "relative to the admissibility of any statements taken from appellant while he was at the juvenile home." At this hearing Police Captain Nicholas Valenti testified that on the evening of November 26, 1968, he talked to appellant at the Juvenile Detention Center in the presence of his parents, a deputy prosecuting attorney and at least two other police officers. According to Captain Valenti, he first advised appellant of "his rights," including his right not to make a statement, and his right to have a lawyer and if his family could not afford a lawyer that the court would appoint one. He also warned appellant that any statement he made would be used against him. He then questioned appellant to determine his education and that he understood what had been told him. Captain Valenti testified that when he told appellant. he could have a lawyer, he replied that he understood what was told him, but that appellant did not say by express words that he did or did not want a lawyer. However, Captain Valenti testified that from the conversation he understood that appellant "wanted to talk to me," and he replied "Yes, sir," when asked if he wanted "to answer my questions." At the conclusion of the testimony of Captain Valenti, appellant's counsel moved that "Any testimony relative to what was said" by appellant to any police officers while he was "being treated as a juvenile" and while at the Juvenile Detention Center be suppressed on the grounds that they were made "as a violation of the Missouri Juvenile Code" as interpreted by the first Arbeiter case, and also "the United States Supreme Court in-

terpretation of a juvenile code in the matter known as the application of Gault [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527]." After some discussion and before any ruling was made, counsel for appellant called Robert Stevens, Sr., appellant's father, as a witness. Mr. Stevens testified that when appellant was brought into the room he asked him "to tell what happened that morning," and that Captain Valenti "did not question my son," but that he only "interrupted his conversation with me." Mr. Stevens further testified that while the police officers were there he asked appellant to tell him what he did that day, and that "about every four or five words Valenti would butt in." He added that after he told appellant not to say anything more, there were no further answers made by him. This concluded the evidence at the interlocutory hearing, and no further or additional reasons were advanced in support of the motion to suppress. In the motion for new trial appellant's assignment of error did not expressly present the first of the two objections now asserted, that is, that presence of counsel was not waived, and when the trial court denied the motion to suppress it did not expressly rule whether the evidence affirmatively showed that presence of counsel was waived. This unquestionably resulted from the fact that the contention was not advanced as a reason to suppress.

■ We conclude that the first reason now advanced on this appeal in support of the contention that it was error to admit the statements is without merit for two reasons. First, the statements when offered in evidence were not objected to for the first reason now advanced, and a trial court is not to be held to have committed error in admitting testimony for a reason not presented to it. It is the procedural rule in this state that reasons urged in a brief which were not advanced to the trial court are of no avail. State v. Davis, Mo., 251 S.W.2d 610, 616; State v. Hampton, Mo., 275 S.W.2d 356, 359. Such rule serves a legitimate state interest in the trial of a criminal case in that it prevents an accused from trapping the trial court by presenting to it an unmeritorious reason in support of an objection, and then presenting an entirely different reason to the appellate court. When such legitimate state interest exists, as here, the state may enforce the rule even though the reason advanced on appeal may pertain to some alleged federally protected constitutional right. Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408; State v. Harrington, Mo., 435 S.W.2d 318.

■ Our second reason is that the evidence at the interlocutory hearing clearly shows that appellant was offered counsel but intelligently and understandingly rejected the offer, and that a "silent record" is not relied on as a basis of presuming waiver of counsel at the interrogation. Appellant was twice told he was entitled to have counsel present, and that if his parents could not afford to employ counsel the court would appoint counsel. Appellant affirmatively stated that he understood his rights in this respect, and the second time appellant was told that his parents were present. To say that this was not an offer of counsel if desired is to place a technicality above all reasonable appraisal of the circumstances. In addition, after being offered counsel appellant affirmatively stated in the presence of his parents that he wanted to answer questions, and as demonstrating the voluntariness and the understanding on appellant's part, when his father told him to say nothing more, no further statement was made. Although the evidence supports a conclusion that it was appellant's father and not the police who interrogated him, and that it was at the father's suggestion that appellant said anything in the presence of the police officers, we do not base our conclusion on that circumstance because the father also testified that Captain Valenti did "butt" in and ask questions. However, the presence of his parents adds a convincing circumstance that no unfair or improper advantage was taken of appellant, and that his statements

were voluntarily made. We conclude that the record affirmatively demonstrates, as distinguished from a presumption based on a "silent record," that appellant voluntarily, intelligently and understandingly waived the right to the presence of counsel at the interrogation.

■ We also rule that the statements were not made in violation of the rules announced in either of the Arbeiter cases. In the first case (408 S.W.2d 26) a written confession was obtained from a fifteen-year-old person *before* he was turned over or delivered to the juvenile authorities as required by § 211.061. In that case the court expressly stated that the facts of that case did not call for it to "consider statements of a juvenile in response to questioning after § 211.061 has been complied with," which is the situation in this case. In the second Arbeiter case (449 S.W.2d 627) this court held inadmissible statements by an accused juvenile made to a juvenile officer without any warning of the consequences and at a time when the officer was talking in a "relaxed, nonadversary atmosphere." That is not the situation here.

Appellant's contention does not go beyond the assertion that the statements were inadmissible under the rules announced in the two Arbeiter cases, but for the reasons above set forth neither of those cases result in the statements not being admissible. The admissibility of the statements is governed by State v. Sinderson, Mo., 455 S.W.2d 486, a case which in many respects is remarkedly similar to this one. In addition, the cautionary statement in Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, pertaining to the presence of "a lawyer or an adult relative or friend" during interrogation of a fourteen-year-old accused juvenile was strictly observed in this case. We conclude that no prejudicial error resulted from the admission in evidence of the statements.

Appellant's point III is that the court committed prejudicial error "in allowing into testimony [appellant's] statement, 'Are you sure I am the only one?' made to the police officers at the school." We note that in the assignment of error in the motion for new trial, appellant attributes this testimony to Donald Loehr, Chief of Police of Ballwin, Missouri. However, we find no testimony by him to this effect. We do find such testimony by Sergeant Beckett, and we shall treat his testimony as that to which this point pertains.

Chief Loehr, Officer Gockel, and Sergeant Beckett went to the Junior High School about five o'clock of the afternoon of November 26, 1968, and Chief Loehr advised appellant that he was being placed in custody for suspicion of homicide. Officer Gockel then advised appellant of his "rights under the Miranda decision" by reading from a card he removed from his pocket, and he then told appellant "not to make any statement to myself or any police officer until he arrived at the St. Louis Juvenile Detention Center." Appellant then started to walk down the hall, and appellant turned to Sergeant Beckett and said, "Are you sure I am the only one?" This statement, or question, was not made as the result of any question asked appellant by any of the police officers, but it was volunteered by appellant.

Appellant contends that at the time the above statement was made he had been taken into custody or had been deprived of his freedom in a significant way, and that the police knew he was a juvenile. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, is cited, and appellant argues that the admission in evidence of this statement was error for the same reasons advanced in point II, which were that appellant had not waived the presence of counsel at interrogation, and that the admission of the testimony violated the rules announced in the two Arbeiter cases.

■ We conclude that no error occurred. When Sergeant Beckett testified that appellant volunteered the above state-

ment in the form of a question no objection whatever was made. In addition, on cross-examination, counsel for appellant went into the circumstances of appellant making the statement in considerable detail. Under these circumstances, the issue was not preserved for appellate review, State v. Richardson, Mo., 321 S.W.2d 423; State v. Terry, Mo., 325 S.W.2d 1, and absent plain error within the meaning of Supreme Court Rule 27.25, V.A.M.R., the issue should not be reviewed.

■ The admission in evidence of the testimony of Sergeant Beckett that appellant made the statement did not constitute plain error. In fact the testimony was proper. Volunteered statements to the police are not excluded by the ruling of Miranda v. State of Arizona, supra, and are not inadmissible on the ground that an accused did not waive his right to counsel at interrogation. Gregg v. State, Mo., 446 S.W.2d 630. In addition, neither the first nor second Arbeiter case makes the testimony inadmissible. In the first case (408 S.W.2d 26), the court stated that it did not have under consideration "the question of spontaneous statements by a juvenile prior to being taken before the juvenile judge or juvenile officer." The second case (449 S.W.2d 627) considered only the admissibility of a statement given by a juvenile to the juvenile officer without any warning of the consequences and at a time when the officer was talking in a "relaxed, nonadversary atmosphere." In State v. Sinderson, supra, it was held that statements made by a juvenile to police in an interrogation when in custody of the juvenile court, but after being fully advised of his constitutional rights and being aware that the questioning authorities were his adversaries, were admissible in evidence. If such a statement is admissible, then certainly a volunteered statement after full advice of his constitutional rights would be admissible. We find no error for the reasons assigned, much less plain error affecting substantial rights.

Appellant asserts in points V and VI that the trial court committed prejudicial error in admitting into evidence the testimony of Thomas Mound and Ralph Turnbough concerning statements made by appellant while in the Juvenile Detention Center.

Thomas Mound, a fellow detainee of appellant, testified that during an argument at the dinner table appellant said that he would kick him "like I beat that woman's head in." Ralph Turnbough, another fellow detainee and appellant's roommate, testified that in a conversation appellant stated that he was there for murder and that he had beaten Mrs. Abbott over the head with a barbell approximately seventeen times.

Appellant asserts that § 211.271(3) provides that "All evidence given in cases under this chapter, as well as reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter." He also asserts that by reason of his request for the interlocutory hearing previously referred to, he objected to any evidence of statements by appellant to anyone while at the juvenile center.

■ We do not agree that by the request for an interlocutory hearing, an objection was made to this testimony. The motion was to suppress evidence of "any testimony relative to what was said to this officer or other officers in the juvenile home," and on the ground that the testimony of Captain Valenti as to statements of defendant made to him was a violation of the Juvenile Code. When the testimony of Thomas Mound and Ralph Turnbough was offered no objection whatever was made, and the issue is not preserved for appellate review. However, assuming a valid and sufficient objection on any basis now advanced, it would have been without merit. Miranda v. State of Arizona, supra, does not apply to statements made to non-

police personnel under circumstances not amounting to custodial interrogation by police officers. State v. Kelly, Mo., 439 S.W.2d 487. Appellant's reference to § 211.-271(3) is without merit. The statements of appellant testified to by the two fellow detainees were not "admissions, confessions [or] * * * statements * * * to the juvenile officer [or] juvenile court personnel," nor did they constitute "evidence given" in a case under any part of the Juvenile Code, and therefore they were not rendered inadmissible as evidence by reason of § 211.271(3). They were voluntary statements made to non-police and non-juvenile court personnel, and constituted declarations against interest, and as such were admissible in evidence.

Appellant's Point I is that the trial court erred in "allowing into evidence the testimony of [Officer] Gockel that after he and the Chief of Police Loehr had a conversation with Mrs. Shirley Stevens, mother of [appellant], they proceeded to the high school and arrested [appellant]."

On November 26, 1968, the day following the murder, Chief Loehr and Officer Gockel recovered a yellow shirt and pair of gloves from a multiflora rosebush. The shirt and gloves were shown to appellant's mother, and after "a conversation" with her, Officer Gockel went to appellant's bedroom with appellant's brother and obtained a blue shirt which Mrs. Stevens told him he could keep.

What was said in the "conversation" is not shown, but appellant objected to the question of whether there was a conversation because "that is hearsay," and also because the question called for a conclusion that the conversation was about the yellow shirt. This objection was overruled, and the answer was "yes." Appellant also objected to the question of whether they went "to any other part of the house" after Mrs. Stevens was shown the yellow shirt on the ground that it called for hearsay. In the discussion out of the hearing of the jury reference was made to State v. Chernick,

Mo., 278 S.W.2d 741. After considerable discussion the objection was overruled, and Officer Gockel testified about obtaining the blue shirt, and that the shirts and the gloves were subsequently turned over to the police laboratory. Officer Gockel then testified without objection that he and Chief Loehr left the Stevens residence about 430 o'clock and went to the Crestwood Junior High School, and that appellant "was taken into protective custody and charged with homicide."

We consider this point to be without merit for two reasons. First, after the witness testified that a conversation was had with appellant's mother, there was no objection to the testimony that the officers then went to the high school and arrested appellant. See the cases cited supra as to the need for objections to testimony to preserve the matter for appellate review.

■ Second, the testimony was not objectionable. Appellant cites and relies on State v. Chernick, Mo., 278 S.W.2d 741, supra, and State v. Blocton, Mo., 394 S.W.2d 323. In the Chernick case several persons were involved in a robbery and one was captured at the scene. The prosecutor was permitted to testify over objection that he interviewed the captured participant and then "we put an arrest order out for Glenn Chernick." In addition, in oral argument the State argued strongly that this was a circumstance which showed Chernick's involvement. In the Blocton case, a police officer testified that he saw two men flee from a scene of a robbery, that they had fired at him, and that one had been captured. He then testified over objection that he had "learned [the name of defendant] from Otto Woods," the captured participant. In each case it was held that statements of one co-conspirator or a co-actor made prior to the formation or after the consummation of the unlawful combination is hearsay, and that they are not binding upon the co-conspirator or co-actor who is on trial. That is not the situation in this case. There is no contention or inti-

mation that Mrs. Stevens was a co-conspirator or co-actor. In addition, if it be considered that statements made by Mrs. Stevens would have been hearsay as to appellant, there was no statement attributed to her which implicated appellant, nor did the witness testify to any information received from her (as the statement of the co-participant's name in the Blocton case), or that he did anything which necessarily was premised upon information orally communicated by appellant's mother (as the statement in the Chernick case).

By appellant's points VII and XI he contends that prejudicial error resulted when the court permitted Dr. James R. Vogt to testify "relative to his findings based upon computer tabulated data which he obtained after placing certain items of evidence in a nuclear reactor," and in admitting into evidence Exhibits 66 through 85.

Dr. James Vogt, assistant professor of nuclear engineering at the University of Missouri at Columbia described in detail the process of neutron activation analysis. We shall not attempt to set forth in detail his explanation of the process, but what seems to be an adequate explanation, at least to a layman, of its development, means of operation, and uses can be had in an article entitled "Identification of Substances by Neutron Activation Analysis" by Robert and Joan Watkins in 15 Am.Jur., Proof of Facts p. 115. See also Vol. 9 Journal of Forensic Sciences p. 119. It may briefly be stated that the process used by Dr. Vogt consisted of placing the sample of a substance to be tested in a nuclear reactor where it was bombarded with neutrons and made radioactive. The sample was then placed in a sodium iodide scintillation detector, where gamma rays radiated from the radioactive sample interacted with the sodium iodide to produce light pulses, which when amplified by a photo-multiplier tube, could be analyzed and a graph or chart made from which could be determined the kind and amount of elements in the sample. Samples from the same source, for example of hair taken from the same individual, produce identical graphs or charts, while a sample of hair taken from some other person, although containing the same elements, produces a different pattern on the graph or chart.

Dr. Vogt testified that he had subjected to neutron activation analysis (1) two samples of hair which had been taken from one of the gloves that was found near appellant's house; (2) a sample of hair taken from the yellow shirt which was found with the gloves; (3) a sample of hair from appellant's head; (4) a sample of hair taken from a hair roller used by the deceased, and admittedly her hair; (5) a sample of hair found in the hallway of deceased's house; (6) samples of threads used in sewing the hem of the sleeves of the yellow and blue shirts; and (7) samples of thread used in sewing the sleeve to the shoulder of the yellow and blue shirts. Based on the results of the neutron activation analysis, and his reading of the graphs produced thereby, Dr. Vogt testified that in his opinion (1) the sample of hair from the roller, the sample of hair found in the hall, one of the samples of hair found on the glove, and the sample of hair found on the yellow shirt were all from the same source, that is, the same person; (2) that the sample of the second hair found on the glove and the sample of hair from appellant's head came from the same source; and (3) the thread from the shoulder of the yellow shirt was not the same as the thread from the shoulder of the blue shirt, but that the thread used in sewing the hem of the sleeves of both shirts were the same.

The conclusion sought to be presented by this testimony concerning the identity of the samples of hair, when considered with other testimony, was that on appellant's glove were found strands of hair, one of which came from him and the other from the deceased. As to the tests on the thread, there was testimony that when the yellow and blue shirts were purchased, they were long sleeved, but that appellant's mother had cut the sleeves off and hemmed them. The conclusion sought to be presented was that

the yellow shirt, on which blood stains and a hair from the deceased were found, was appellant's shirt.

In his challenge to the testimony of Dr. Vogt and to the admission in evidence of Exhibits 66 through 85 (which were the hair and thread samples and the graphs produced in the tests) appellant first contends that the qualification of Dr. Vogt as an expert was not established.

In order for a witness to be qualified as an expert, "it must appear that by reason of education or specialized experience he possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or drawing correct conclusions." Shelby County R–IV School District v. Herman, Mo., 392 S.W.2d 609, 616. The determination of whether a witness meets the qualifications of an expert so that he may express an opinion rests largely in the discretion of the trial court, State v. Terry, Mo., 325 S.W.2d 1, although such determination is reviewable on appeal on the issue of abuse of that discretion. State v. Menard, Mo., 331 S.W.2d 521.

The record clearly shows that Dr. Vogt was educated and experienced in the special field of nuclear physics, and that he had extensive experience in neutron activation analysis of various materials, including the testing of hair. No discussion is needed to conclude that the subjects of nuclear physics and neutron activation analysis are of the nature that persons having no specialized training are incapable of drawing correct conclusions. The trial court did not abuse its discretion in its determination that Dr. Vogt was an expert witness.

Appellant next contends that there was no evidence that the machines or apparatus used in making the tests were functioning properly when the tests were conducted. We note that appellant does not challenge the reliability of the process of neutron activation analysis or the accuracy of the scientific instruments used in making the tests and producing the graphs. We should state, however, that although the process is relatively new, it is not untried, and that testimony of the results of neutron activation analysis has been received in many cases. For example, in the 1970 Supplement to Vol. 15 Am.Jur. Proof of Facts, at p. 16, it is stated: "The enthusiastic use of neutron activation analysis (NAA) by a variety of federal government agencies has been largely responsible for the growing acceptance of such evidence in both federal and state courts." There is then listed 75 cases, including this case, wherein evidence of the results of neutron activation analysis was admitted in evidence. Turning back now to the contention of appellant, Dr. Vogt testified as to how the equipment was maintained and by whom. In addition, he stated that tests were conducted, both before and after the tests applicable to this case were made, to determine that the equipment was working properly. He had personally checked the accuracy of the computer at least every other day for a month prior to the tests made for this case by feeding into it known data and checking the result with the known answer. This unquestionably established a prima facie case of accuracy and reliability. There is no evidence to the contrary.

Appellant's remaining challenge to the evidence of the neutron activation analysis is that he should have been notified in advance of the trial that the evidence would be offered. Dr. Vogt was indorsed as a witness, and in this way, which is all the State was required to do, appellant was so notified. Appellant relies on United States v. Kelly, 2 Cir., 420 F.2d 26. That case does not support his contention. The defendants in that case moved for discovery of the results of certain tests conducted by the government, and the court ordered the disclosure of those tests. Thereafter, a neutron activation test was conducted and defendants were not informed of the results. The court held that the Federal Rules of Criminal Pro-

cedure imposed a continuing duty to disclose subsequently made tests.

It may be that after discovering from Dr. Vogt prior to trial the nature of his testimony, upon request the trial court would have directed that appellant be informed of the results, but error cannot be predicated upon a failure to advise appellant of the results when no request therefor was made. In addition, there was no wrongful concealment of the fact of the tests or the results.

Appellant's point XIII is that the court erred in admitting into evidence Exhibit 89, which was a black and white photograph of the body of the deceased, because, as asserted in his brief, it was "a particularly bloody and gruesome picture which displayed to the jury the battered remains of the deceased." The photograph shows the body of the deceased lying face down on the floor, bare from the waist down, with an overcoat covering the upper portion of the body. The photograph also shows blood on the head, and a barbell lying next to the body, partially hidden by the overcoat. The trial court admitted the exhibit over appellant's objection on the basis that it explained the testimony of a witness who said that when he entered the house he could not see the face of the deceased, and that he did not see the barbell.

The admission of a photograph of the body of the deceased in a homicide prosecution rests within the sound discretion of the trial court, and it is properly admitted when it tends to show some fact or circumstance material to the case, such as the nature and location of the fatal wound, State v. Moore, Mo., 303 S.W.2d 60; or when it enables the jury to better understand the fact and the testimony of witnesses, State v. Thresher, Mo., 350 S.W.2d 1, or tends to corroborate, explain or clarify the testimony of witnesses, State v. Edwards, Mo., 435 S.W.2d 1. The photograph was helpful to a better understanding of the facts, and the testimony of some of

the witnesses, and therefore was material. It is not made inadmissible because witnesses may have orally described what is shown by the picture, State v. Spica, Mo., 389 S.W.2d 35, or because it presents a gruesome sight, State v. Moore, supra. If photographic views are shocking, when presenting an accurate picture, it is because the crime is one of that sort, whether described in words or pictures. The court did not abuse its discretion.

Point XIV is that the court erred in overruling appellant's motion for acquittal at the end of the State's case. This is of no merit for two reasons. First, appellant waived any error by presenting evidence on his behalf. State v. Hill, Mo., 438 S.W.2d 244. Second, the State had clearly made a submissible case of second degree murder, of which he was found guilty, and in his motion for new trial appellant does not assign as error that the evidence was insufficient to support the verdict rendered.

By his point XV appellant asserts that the court erred in instructing the jury on second degree murder because he was guilty of first degree murder or guilty of nothing, and by his point XVII he asserts that if it was not error to give such an instruction, then it was error to refuse to give an instruction on manslaughter.

The immediate answer to point XV is that the evidence authorized a finding of second degree murder. The principal distinction between first and second degree murder is the element of deliberation. " 'The general rule is that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is used by him at a vital part of the body, absent *proof* of other facts tending to show deliberation to raise such killing to first degree murder, or to show want of premeditation and malice to reduce the killing to manslaughter, * * *.' " State v. Williams, Mo., 442 S.W.2d 61. Under the evidence

in this case the jury was justified in finding every element of first degree murder, except, in its judgment it could have believed that there was no deliberation. Certainly the evidence did not compel a finding of deliberation. In that event the offense was second degree murder, and the evidence supported the giving of the instruction.

As to point XVII, there is no *proof* of facts tending to show want of premeditation and malice, and after setting forth the statement above quoted, this court in State v. Williams, supra, added: "We emphasize that there must be *proof* of facts tending to show want of premeditation and malice to warrant an instruction on manslaughter." Appellant does not attempt to set forth any facts which he contends constituted such proof, and he cites no cases. There is no merit to either point.

In point XVIII appellant contends that prejudicial error resulted by the refusal of the court to give one of four requested and tendered instructions on the weight to be given circumstantial evidence. Appellant cites State v. Irby, Mo., 423 S.W.2d 800, a case in which it was held that the evidence did not support the verdict, and State v. Thompson, Mo., 428 S.W.2d 742, and State v. Aguilar, Mo., 429 S.W.2d 754. The Aguilar case was wholly circumstantial as to the identity of the defendant as the one who committed the crime, and the Thompson case was wholly circumstantial as to whether the property in the possession of the defendant was the stolen property. Appellant's contention is that the evidence in this case tending to implicate him is wholly circumstantial.

Generally stated, when the State's case rests wholly upon circumstantial evidence, the accused, upon proper request, is entitled to have the trial court instruct the jury on the collateral issue as to the effect of or weight to be given by the jury to circumstantial evidence. State v. Regazzi, Mo., 379 S.W.2d 575. However,

the giving of such instruction is not mandatory when part of the evidence is direct. State v. Huff, 353 Mo. 791, 184 S.W.2d 447; State v. Loston, Mo., 234 S.W.2d 535. Admissions by the accused are direct evidence of his guilt. State v. Loston, supra; State v. Regazzi, supra; State v. Criger, Mo., 46 S.W.2d 537; State v. Spica, Mo., 389 S.W.2d 35, 53. In this case there was evidence that appellant had made admissions that he had killed Mrs. Abbott, and for that reason the trial court did not err in refusing the requested cautionary instructions pertaining to circumstantial evidence.

Appellant also contends that the rule of leaving to the discretion of the trial court whether the instruction should be given when there is direct evidence is arbitrary and unreasonable. We do not agree. In fact, an instruction such as those requested, would tend to be confusing when there also is direct evidence because the instruction creates a different test for the weight to be given, and would not be applicable to the direct evidence.

By his point XVI appellant challenges Instruction No. 6, on the issue of intent, and asserts error because (1) it permitted the jury to find intent by either direct or circumstantial evidence and the court did not instruct on circumstantial evidence, and (2) the instruction was either redundant or should have been included in the verdict directing instruction on second degree murder. We do not set out the instruction because an identical instruction is set out, and approved in State v. Deutschmann, Mo., 392 S.W.2d 279, at p. 283.

As previously ruled, it was not error in this case to refuse an instruction on circumstantial evidence, and as stated in State v. Deutschmann, supra, "intent need not be proved by direct testimony but may be inferred from the facts and circumstances." Therefore, the instruction properly advised the jury in this respect,

and by giving it there did not arise a requirement that an instruction be given defining circumstantial evidence and the weight to be given to it. State v. Mulconry, Mo., 270 S.W. 375.

■ As to appellant's second argument, the verdict directing instruction did not define intent, and therefore Instruction No. 6 was not redundant or repetitious. In addition, it is not required that definitions be contained in the verdict directing instruction, but they may be in a separate instruction. State v. Brookshire, Mo., 368 S.W.2d 373, 383.

■ Appellant's last point, No. XIX, is that the court erred in refusing to instruct on motive, and to give one of several instructions tendered and requested. This contention is answered by State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734, a case in which the accused was found guilty of second degree murder, wherein it was said: "The court refused accused's offered instructions on motive. Motive is not an element of crime and proof of it is not essential to sustain a conviction. * * * Accordingly an instruction on motive is not required. Proof of motive does have great probative force in determining guilt, especially in cases of circumstantial evidence. But since motive is merely a circumstance to be considered by the jury and not conclusive of accused's innocence or guilt, it need not be singled out by a special instruction. The court's action in refusing to instruct on motive was not error." See also State v. Koch, 322 Mo. 106, 16 S.W.2d 205; State v. Gregg, Mo., 399 S.W.2d 7.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.